## NEVADA DEPARTMENT OF HUMAN RESOURCES ET AL. *v.* HIBBS ET AL.

No. 01–1368.   Argued January 15, 2003—Decided May 27, 2003

722

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CONNOR, SOUTER, GINSBURG, and BREYER, JJ., joined. SOUTER, J., filed a concurring opinion, in which GINSBURG and BREYER, JJ., joined, *post*, p. 740. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 740. SCALIA, J., filed a dissenting opinion, *post*, p. 741. KENNEDY, J., filed a dissenting opinion, in which SCALIA and THOMAS, JJ., joined, *post*, p. 744.

*Paul G. Taggart,* Deputy Attorney General of Nevada, argued the cause for petitioners. With him on the briefs were *Frankie Sue Del Papa,* Attorney General, and *Traci L. Lovitt.*

*Cornelia T. L. Pillard* argued the cause for respondent Hibbs. With her on the brief were *Jonathan J. Frankel, Judith L. Lichtman,* and *Treva J. Hearne.*

*Assistant Attorney General Dinh* argued the cause for the United States. With him on the brief were *Solicitor General Olson, Assistant Attorneys General Boyd* and *McCallum, Deputy Solicitor General Clement, Patricia A. Millett, Mark B. Stern,* and *Kathleen Kane.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Alabama et al. by *Bill Pryor,* Attorney General of Alabama, *Nathan A. Forrester,* Solicitor General, and *Charles B. Campbell,* Deputy Solicitor Gen-

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

The Family and Medical Leave Act of 1993 (FMLA or Act) entitles eligible employees to take up to 12 work weeks of unpaid leave annually for any of several reasons, including the onset of a "serious health condition" in an employee's spouse, child, or parent. 107 Stat. 9, 29 U. S. C. § 2612(a)(1)(C). The Act creates a private right of action to seek both equitable relief and money damages "against any employer (including a public agency) in any Federal or State · court of competent jurisdiction," § 2617(a)(2), should that em-

eral, and by the Attorneys General for their respective States as follows: *Bruce M. Botelho* of Alaska, *M. Jane Brady* of Delaware, *Earl I. Anzai* of Hawaii, *Steve Carter* of Indiana, *Don Stenberg* of Nebraska, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Charles M. Condon* of South Carolina, *Paul G. Summers* of Tennessee, *John Cornyn* of Texas, *Mark Shurtleff* of Utah, and *Jerry W. Kilgore* of Virginia; for the Coalition for Local Sovereignty by *Kenneth B. Clark;* and for the Pacific Legal Foundation by *Deborah J. La Fetra.*

Briefs of *amici curiae* urging affirmance were filed for the State of New York et al. by *Eliot Spitzer,* Attorney General of New York, *Caitlin J. Halligan,* Solicitor General, *Michelle Aronowitz,* Deputy Solicitor General, *Denise A. Hartman, Robert H. Easton,* and *David Axinn,* Assistant Solicitors General, and *Hilary Klein,* Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Richard Blumenthal* of Connecticut, *James Ryan* of Illinois, *Michael Hatch* of Minnesota, *Patricia A. Madrid* of New Mexico, and *Christine O. Gregoire* of Washington; for the American Federation of Labor and Congress of Industrial Organizations by *Jonathan P. Hiatt, James B. Coppess, Laurence Gold,* and *Michael H. Gottesman;* for the Lawyers' Committee for Civil Rights Under Law et al. by *Sidney S. Rosdeitcher, Barbara R. Arnwine, Thomas J. Henderson, Michael Foreman, Vincent A. Eng, Dennis Courtland Hayes,* and *Angela Ciccolo;* for the National Women's Law Center et al. by *Walter Dellinger, Pamela Harris, Marcia D. Greenberger, Judith C. Appelbaum,* and *Dina R. Lassow;* for Senator Christopher Dodd et al. by *Mark E. Haddad* and *Carter G. Phillips;* and for Alice Kessler-Harris et al. by *Isabelle Katz Pinzler, Conrad K. Harper,* and *William T. Russell, Jr.*

ployer "interfere with, restrain, or deny the exercise of" FMLA rights, §2615(a)(1). We hold that employees of the State of Nevada may recover money damages in the event of the State's failure to comply with the family-care provision of the Act.

Petitioners include the Nevada Department of Human Resources (Department) and two of its officers. Respondent William Hibbs (hereinafter respondent) worked for the Department's Welfare Division. In April and May 1997, he sought leave under the FMLA to care for his ailing wife, who was recovering from a car accident and neck surgery. The Department granted his request for the full 12 weeks of FMLA leave and authorized him to use the leave intermittently as needed between May and December 1997. Respondent did so until August 5, 1997, after which he did not return to work. In October 1997, the Department informed respondent that he had exhausted his FMLA leave, that no further leave would be granted, and that he must report to work by November 12, 1997. Respondent failed to do so and was terminated.

Respondent sued petitioners in the United States District Court seeking damages and injunctive and declaratory relief for, *inter alia,* violations of 29 U. S. C. §2612(a)(1)(C). The District Court awarded petitioners summary judgment on the grounds that the FMLA claim was barred by the Eleventh Amendment and that respondent's Fourteenth Amendment rights had not been violated. Respondent appealed, and the United States intervened under 28 U. S. C. §2403 to defend the validity of the FMLA's application to the States. The Ninth Circuit reversed. 273 F. 3d 844 (2001).

We granted certiorari, 536 U. S. 938 (2002), to resolve a split among the Courts of Appeals on the question whether an individual may sue a State for money damages in federal court for violation of §2612(a)(1)(C). Compare *Kazmier* v.

*Widmann,* 225 F. 3d 519, 526, 529 (CA5 2000), with 273 F. 3d 844 (case below).

For over a century now, we have made clear that the Constitution does not provide for federal jurisdiction over suits against nonconsenting States. *Board of Trustees of Univ. of Ala.* v. *Garrett,* 531 U. S. 356, 363 (2001); *Kimel* v. *Florida Bd. of Regents,* 528 U. S. 62, 72–73 (2000); *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.,* 527 U. S. 666, 669–670 (1999); *Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44, 54 (1996); *Hans* v. *Louisiana,* 134 U. S. 1, 15 (1890).

Congress may, however, abrogate such immunity in federal court if it makes its intention to abrogate unmistakably clear in the language of the statute and acts pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment. See *Garrett, supra,* at 363; *Blatchford* v. *Native Village of Noatak,* 501 U. S. 775, 786 (1991) (citing *Dellmuth* v. *Muth,* 491 U. S. 223, 228 (1989)). The clarity of Congress' intent here is not fairly debatable. The Act enables employees to seek damages "against any employer (including a public agency) in any Federal or State court of competent jurisdiction," 29 U. S. C. § 2617(a)(2), and Congress has defined "public agency" to include both "the government of a State or political subdivision thereof" and "any agency of . . . a State, or a political subdivision of a State," §§ 203(x), 2611(4)(A)(iii). We held in *Kimel* that, by using identical language in the Age Discrimination in Employment Act of 1967 (ADEA), 81 Stat. 602, as amended, 29 U. S. C. § 621 *et seq.,* Congress satisfied the clear statement rule of *Dellmuth.* 528 U. S., at 73–78. This case turns, then, on whether Congress acted within its constitutional authority when it sought to abrogate the States' immunity for purposes of the FMLA's family-leave provision.

In enacting the FMLA, Congress relied on two of the powers vested in it by the Constitution: its Article I commerce power and its power under § 5 of the Fourteenth Amendment

to enforce that Amendment's guarantees.[1]   Congress may
not abrogate the States' sovereign immunity pursuant to its
Article I power over commerce.   *Seminole Tribe, supra.*
Congress may, however, abrogate States' sovereign immu-
nity through a valid exercise of its § 5 power, for "the Elev-
enth Amendment, and the principle of state sovereignty
which it embodies, are necessarily limited by the enforce-
ment provisions of § 5 of the Fourteenth Amendment."
*Fitzpatrick* v. *Bitzer,* 427 U. S. 445, 456 (1976) (citation omit-
ted).   See also *Garrett, supra,* at 364; *Kimel, supra,* at 80.

   Two provisions of the Fourteenth Amendment are rele-
vant here: Section 5 grants Congress the power "to enforce"
the substantive guarantees of § 1—among them, equal pro-
tection of the laws—by enacting "appropriate legislation."
Congress may, in the exercise of its § 5 power, do more than
simply proscribe conduct that we have held unconstitutional.
" 'Congress' power "to enforce" the Amendment includes the
authority both to remedy and to deter violation of rights
guaranteed thereunder by prohibiting a somewhat broader
swath of conduct, including that which is not itself forbidden
by the Amendment's text.' "   *Garrett, supra,* at 365 (quoting
*Kimel, supra,* at 81); *City of Boerne* v. *Flores,* 521 U. S. 507,
536 (1997); *Katzenbach* v. *Morgan,* 384 U. S. 641, 658 (1966).
In other words, Congress may enact so-called prophylactic

---

[1] Compare 29 U. S. C. § 2601(b)(1) ("It is the purpose of this Act . . . to
balance the demands of the workplace with the needs of families, to pro-
mote the stability and economic security of families, and to promote na-
tional interests in preserving family integrity") with § 2601(b)(5) ("to pro-
mote the goal of equal employment opportunity for women and men,
pursuant to [the Equal Protection C]lause") and § 2601(b)(4) ("to accom-
plish [the Act's other purposes] in a manner that, consistent with the Equal
Protection Clause . . . , minimizes the potential for employment discrimina-
tion on the basis of sex").   See also S. Rep. No. 103–3, p. 16 (1993) (the
FMLA "is based not only on the Commerce Clause, but also on the guaran-
tees of equal protection and due process embodied in the 14th Amend-
ment"); H. R. Rep. No. 103–8, pt. 1, p. 29 (1993) (same).

legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct.

*City of Boerne* also confirmed, however, that it falls to this Court, not Congress, to define the substance of constitutional guarantees. 521 U. S., at 519–524. "The ultimate interpretation and determination of the Fourteenth Amendment's substantive meaning remains the province of the Judicial Branch." *Kimel*, 528 U. S., at 81. Section 5 legislation reaching beyond the scope of § 1's actual guarantees must be an appropriate remedy for identified constitutional violations, not "an attempt to substantively redefine the States' legal obligations." *Id.*, at 88. We distinguish appropriate prophylactic legislation from "substantive redefinition of the Fourteenth Amendment right at issue," *id.*, at 81, by applying the test set forth in *City of Boerne:* Valid § 5 legislation must exhibit "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end," 521 U. S., at 520.

The FMLA aims to protect the right to be free from gender-based discrimination in the workplace.[2] We have held that statutory classifications that distinguish between males and females are subject to heightened scrutiny. See, *e. g., Craig* v. *Boren*, 429 U. S. 190, 197–199 (1976). For a gender-based classification to withstand such scrutiny, it must "serv[e] important governmental objectives," and "the discriminatory means employed [must be] substantially related to the achievement of those objectives." *United*

---

[2] The text of the Act makes this clear. Congress found that, "due to the nature of the roles of men and women in our society, the primary responsibility for family caretaking often falls on women, and such responsibility affects the working lives of women more than it affects the working lives of men." 29 U. S. C. § 2601(a)(5). In response to this finding, Congress sought "to accomplish the [Act's other] purposes . . . in a manner that . . . minimizes the potential for employment discrimination *on the basis of sex* by ensuring generally that leave is available . . . *on a gender-neutral basis[,]* and to promote the goal of equal employment opportunity *for women and men* . . . ." §§ 2601(b)(4) and (5) (emphasis added).

*States* v. *Virginia*, 518 U. S. 515, 533 (1996) (citations and internal quotation marks omitted). The State's justification for such a classification "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Ibid.* We now inquire whether Congress had evidence of a pattern of constitutional violations on the part of the States in this area.

The history of the many state laws limiting women's employment opportunities is chronicled in—and, until relatively recently, was sanctioned by—this Court's own opinions. For example, in *Bradwell* v. *State*, 16 Wall. 130 (1873) (Illinois), and *Goesaert* v. *Cleary*, 335 U. S. 464, 466 (1948) (Michigan), the Court upheld state laws prohibiting women from practicing law and tending bar, respectively. State laws frequently subjected women to distinctive restrictions, terms, conditions, and benefits for those jobs they could take. In *Muller* v. *Oregon*, 208 U. S. 412, 419, n. 1 (1908), for example, this Court approved a state law limiting the hours that women could work for wages, and observed that 19 States had such laws at the time. Such laws were based on the related beliefs that (1) a woman is, and should remain, "the center of home and family life," *Hoyt* v. *Florida*, 368 U. S. 57, 62 (1961), and (2) "a proper discharge of [a woman's] maternal functions—having in view not merely her own health, but the well-being of the race—justif[ies] legislation to protect her from the greed as well as the passion of man," *Muller, supra*, at 422. Until our decision in *Reed* v. *Reed*, 404 U. S. 71 (1971), "it remained the prevailing doctrine that government, both federal and state, could withhold from women opportunities accorded men so long as any 'basis in reason' "—such as the above beliefs—"could be conceived for the discrimination." *Virginia, supra*, at 531 (quoting *Goesaert, supra*, at 467).

Congress responded to this history of discrimination by abrogating States' sovereign immunity in Title VII of the Civil Rights Act of 1964, 78 Stat. 255, 42 U. S. C. § 2000e–2(a),

and we sustained this abrogation in *Fitzpatrick*. But state gender discrimination did not cease. "[I]t can hardly be doubted that . . . women still face pervasive, although at times more subtle, discrimination . . . in the job market." *Frontiero* v. *Richardson*, 411 U. S. 677, 686 (1973). According to evidence that was before Congress when it enacted the FMLA, States continue to rely on invalid gender stereotypes in the employment context, specifically in the administration of leave benefits. Reliance on such stereotypes cannot justify the States' gender discrimination in this area. *Virginia, supra,* at 533. The long and extensive history of sex discrimination prompted us to hold that measures that differentiate on the basis of gender warrant heightened scrutiny; here, as in *Fitzpatrick,* the persistence of such unconstitutional discrimination by the States justifies Congress' passage of prophylactic § 5 legislation.

As the FMLA's legislative record reflects, a 1990 Bureau of Labor Statistics (BLS) survey stated that 37 percent of surveyed private-sector employees were covered by maternity leave policies, while only 18 percent were covered by paternity leave policies. S. Rep. No. 103–3, pp. 14–15 (1993). The corresponding numbers from a similar BLS survey the previous year were 33 percent and 16 percent, respectively. *Ibid.* While these data show an increase in the percentage of employees eligible for such leave, they also show a widening of the gender gap during the same period. Thus, stereotype-based beliefs about the allocation of family duties remained firmly rooted, and employers' reliance on them in establishing discriminatory leave policies remained widespread.[3]

---

[3] While this and other material described leave policies in the private sector, a 50-state survey also before Congress demonstrated that "[t]he proportion and construction of leave policies available to public sector employees differs little from those offered private sector employees." The Parental and Medical Leave Act of 1986: Joint Hearing before the Subcommittee on Labor-Management Relations and the Subcommittee on Labor

Congress also heard testimony that "[p]arental leave for fathers . . . is rare. Even . . . [w]here child-care leave policies do exist, men, *both in the public and private sectors,* receive notoriously discriminatory treatment in their requests for such leave." Joint Hearing 147 (Washington Council of Lawyers) (emphasis added). Many States offered women extended "maternity" leave that far exceeded the typical 4- to 8-week period of physical disability due to pregnancy and childbirth,[4] but very few States granted men a parallel benefit: Fifteen States provided women up to one year of extended maternity leave, while only four provided men with the same. M. Lord & M. King, The State Reference Guide to Work-Family Programs for State Employees 30 (1991). This and other differential leave policies were not attributable to any differential physical needs of men and women, but rather to the pervasive sex-role stereotype that caring for family members is women's work.[5]

---

Standards of the House Committee on Education and Labor, 99th Cong., 2d Sess., 33 (1986) (hereinafter Joint Hearing) (statement of Meryl Frank, Director of the Yale Bush Center Infant Care Leave Project). See also *id.,* at 29–30.

[4] See, *e. g., id.,* at 16 (six weeks is the medically recommended pregnancy disability leave period); H. R. Rep. No. 101–28, pt. 1, p. 30 (1989) (referring to Pregnancy Discrimination Act legislative history establishing four to eight weeks as the medical recovery period for a normal childbirth).

[5] For example, state employers' collective-bargaining agreements often granted extended "maternity" leave of six months to a year to women only. Gerald McEntee, President of the American Federation of State, County and Municipal Employees, AFL–CIO, testified that "the vast majority of our contracts, even though we look upon them with great pride, really cover essentially maternity leave, and not paternity leave." The Parental and Medical Leave Act of 1987: Hearings before the Subcommittee on Children, Family, Drugs and Alcoholism of the Senate Committee on Labor and Human Resources, 100th Cong., 1st Sess., pt. 1, p. 385 (1987) (hereinafter 1987 Senate Labor Hearings). In addition, state leave laws often specified that catchall leave-without-pay provisions could be used for extended maternity leave, but did not authorize such leave for paternity purposes. See, *e. g.,* Family and Medical Leave Act of 1987: Joint Hearing before the House Committee on Post Office and Civil Service, 100th Cong.,

Finally, Congress had evidence that, even where state laws and policies were not facially discriminatory, they were applied in discriminatory ways. It was aware of the "serious problems with the discretionary nature of family leave," because when "the authority to grant leave and to arrange the length of that leave rests with individual supervisors," it leaves "employees open to discretionary and possibly unequal treatment." H. R. Rep. No. 103–8, pt. 2, pp. 10–11 (1993). Testimony supported that conclusion, explaining that "[t]he lack of uniform parental and medical leave policies in the work place has created an environment where [sex] discrimination is rampant." 1987 Senate Labor Hearings, pt. 2, at 170 (testimony of Peggy Montes, Mayor's Commission on Women's Affairs, City of Chicago).

In spite of all of the above evidence, JUSTICE KENNEDY argues in dissent that Congress' passage of the FMLA was unnecessary because "the States appear to have been ahead of Congress in providing gender-neutral family leave benefits," *post*, at 750, and points to Nevada's leave policies in particular, *post*, at 755. However, it was only "[s]ince Federal family leave legislation was first introduced" that the States had even "begun to consider similar family leave initiatives." S. Rep. No. 103–3, at 20; see also S. Rep. No. 102–

---

1st Sess., 2–5 (1987) (Rep. Gary Ackerman recounted suffering expressly sex-based denial of unpaid leave of absence where benefit was ostensibly available for "child care leave").

Evidence pertaining to parenting leave is relevant here because state discrimination in the provision of both types of benefits is based on the same gender stereotype: that women's family duties trump those of the workplace. JUSTICE KENNEDY's dissent (hereinafter dissent) ignores this common foundation that, as Congress found, has historically produced discrimination in the hiring and promotion of women. See *post*, at 748–749. Consideration of such evidence does not, as the dissent contends, expand our § 5 inquiry to include "*general* gender-based stereotypes in employment." *Post*, at 749 (emphasis added). To the contrary, because parenting and family leave address very similar situations in which work and family responsibilities conflict, they implicate the same stereotypes.

68, p. 77 (1991) (minority views of Sen. Durenberger) ("[S]o few states have elected to enact similar legislation at the state level").

Furthermore, the dissent's statement that some States "had adopted some form of family-care leave" before the FMLA's enactment, *post*, at 750, glosses over important shortcomings of some state policies. First, seven States had childcare leave provisions that applied to women only. Indeed, Massachusetts required that notice of its leave provisions be posted only in "establishment[s] in which females are employed."[6] These laws reinforced the very stereotypes that Congress sought to remedy through the FMLA. Second, 12 States provided their employees no family leave, beyond an initial childbirth or adoption, to care for a seriously ill child or family member.[7] Third, many States pro-

---

[6] Mass. Gen. Laws, ch. 149, § 105D (West 1997) (providing leave to "female employee[s]" for childbirth or adoption); see also 3 Colo. Code Regs. § 708-1, Rule 80.8 (2002) (pregnancy disability leave only); Iowa Code § 216.6(2) (2000) (former § 601A.6(2)) (same); Kan. Admin. Regs. 21-32-6(d) (2003) ("a reasonable period" of maternity leave for female employees only); N. H. Stat. Ann. § 354-A:7(VI)(b) (Michie Supp. 2000) (pregnancy disability leave only); La. Stat. Ann. § 23:1008(A)(2) (West Supp. 1993) (repealed 1997) (4-month maternity leave for female employees only); Tenn. Code Ann. § 4-21-408(a) (1998) (same).

The dissent asserts that four of these schemes—those of Colorado, Iowa, Louisiana, and New Hampshire—concern "pregnancy disability leave only." *Post*, at 752. But Louisiana provided women with four months of such leave, which far exceeds the medically recommended pregnancy disability leave period of six weeks. See n. 4, *supra*. This gender-discriminatory policy is not attributable to any different physical needs of men and women, but rather to the invalid stereotypes that Congress sought to counter through the FMLA. See *supra*, at 731.

[7] See 3 Colo. Code Regs. § 708-1, Rule 80.8 (2002); Del. Code Ann., Tit. 29, § 5116 (1997); Iowa Code § 216.6(2) (2000); Kan. Admin. Regs. 21-32-6 (2003); Ky. Rev. Stat. Ann. § 337.015 (Michie 2001); La. Stat. Ann. § 23:1008(A)(2) (West Supp. 1993); Mass. Gen. Laws, ch. 149, § 105(D) (West 1997); Mo. Rev. Stat. § 105.271 (2000); N. H. Stat. Ann. § 354-A:7(VI)(b) (Michie Supp. 2000); N. Y. Lab. Law § 201-c (West 2002); Tenn. Code

vided no statutorily guaranteed right to family leave, offering instead only voluntary or discretionary leave programs. Three States left the amount of leave time primarily in employers' hands.[8] Congress could reasonably conclude that such discretionary family-leave programs would do little to combat the stereotypes about the roles of male and female employees that Congress sought to eliminate. Finally, four States provided leave only through administrative regulations or personnel policies, which Congress could reasonably conclude offered significantly less firm protection than a federal law.[9] Against the above backdrop of limited state leave policies, no matter how generous petitioners' own may have been, see *post*, at 755 (dissent), Congress was justified in enacting the FMLA as remedial legislation.[10]

---

Ann. § 4–21–408(a) (1998); U. S. Dept. of Labor, Women's Bureau, State Maternity/Family Leave Law, p. 12 (June 1993) (citing a Virginia personnel policy).

[8] See 3 Colo. Code Regs. § 708–1, Rule 80.8 (2002); Kan. Admin. Regs. 21–32–6 (2003); N. H. Stat. Ann. § 354–A:7(VI)(b) (Michie Supp. 2000). Oklahoma offered only a system by which employees could voluntarily donate leave time for colleagues' family emergencies. Okla. Stat., Tit. 74, § 840–2.22 (historical note) (West 2002).

[9] See 3 Colo. Code Regs. § 708–1, Rule 80.8 (2002); Kan. Admin. Regs. 21–32–6 (2003); Wis. Admin. Code ch. DWD 225 (1997) (former ch. ILHR 225); State Maternity/Family Leave Law, *supra*, at 12 (Virginia).

[10] Contrary to the dissent's belief, we do not hold that Congress may "abrogat[e] state immunity from private suits whenever the State's social benefits program is not enshrined in the statutory code and provides employers with discretion," *post*, at 753, or when a State does not confer social benefits "as generous or extensive as Congress would later deem appropriate," *post*, at 752. The dissent misunderstands the purpose of the FMLA's family-leave provision. The FMLA is not a "substantive entitlement program," *post*, at 754; Congress did not create a particular leave policy for its own sake. See *infra*, at 737–738. Rather, Congress sought to adjust family-leave policies in order to eliminate their reliance on, and perpetuation of, invalid stereotypes, and thereby dismantle persisting gender-based barriers to the hiring, retention, and promotion of women in the workplace. In pursuing that goal, for the reasons discussed above,

In sum, the States' record of unconstitutional participation in, and fostering of, gender-based discrimination in the administration of leave benefits is weighty enough to justify the enactment of prophylactic § 5 legislation.[11]

We reached the opposite conclusion in *Garrett* and *Kimel.* In those cases, the § 5 legislation under review responded to a purported tendency of state officials to make age- or disability-based distinctions. Under our equal protection case law, discrimination on the basis of such characteristics is not judged under a heightened review standard, and passes muster if there is "a rational basis for doing so at a class-based level, even if it 'is probably not true' that those reasons are valid in the majority of cases." *Kimel,* 528 U. S., at 86 (quoting *Gregory* v. *Ashcroft,* 501 U. S. 452, 473 (1991)). See also *Garrett,* 531 U. S., at 367 ("States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational"). Thus, in order to impugn the constitutionality of state discrimination against the disabled or the elderly, Congress must identify, not just the existence of age- or disability-based state decisions, but a "widespread pattern" of irrational reliance on such criteria. *Kimel, supra,* at 90. We found no such showing with respect to the ADEA and Title I of the Americans with Disabilities Act of 1990 (ADA). *Kimel, supra,* at 89; *Garrett, supra,* at 368.

---

*supra,* at 733–734 and this page, Congress reasonably concluded that state leave laws and practices should be brought within the Act.

[11] Given the extent and specificity of the above record of unconstitutional state conduct, it is difficult to understand the dissent's accusation that we rely on "a simple recitation of a general history of employment discrimination against women." *Post,* at 746. As we stated above, our holding rests on congressional findings that, at the time the FMLA was enacted, States "rel[ied] on invalid gender stereotypes in the employment context, *specifically in the administration of leave benefits.*" *Supra,* at 730 (emphasis added). See *supra,* at 730–732.

Here, however, Congress directed its attention to state gender discrimination, which triggers a heightened level of scrutiny. See, *e. g., Craig,* 429 U. S., at 197–199. Because the standard for demonstrating the constitutionality of a gender-based classification is more difficult to meet than our rational-basis test—it must "serv[e] important governmental objectives" and be "substantially related to the achievement of those objectives," *Virginia,* 518 U. S., at 533—it was easier for Congress to show a pattern of state constitutional violations. Congress was similarly successful in *South Carolina* v. *Katzenbach,* 383 U. S. 301, 308–313 (1966), where we upheld the Voting Rights Act of 1965: Because racial classifications are presumptively invalid, most of the States' acts of race discrimination violated the Fourteenth Amendment.

The impact of the discrimination targeted by the FMLA is significant. Congress determined:

> "Historically, denial or curtailment of women's employment opportunities has been traceable directly to the pervasive presumption that women are mothers first, and workers second. This prevailing ideology about women's roles has in turn justified discrimination against women when they are mothers or mothers-to-be." Joint Hearing 100.

Stereotypes about women's domestic roles are reinforced by parallel stereotypes presuming a lack of domestic responsibilities for men. Because employers continued to regard the family as the woman's domain, they often denied men similar accommodations or discouraged them from taking leave. These mutually reinforcing stereotypes created a self-fulfilling cycle of discrimination that forced women to continue to assume the role of primary family caregiver, and fostered employers' stereotypical views about women's commitment to work and their value as employees. Those perceptions, in turn, Congress reasoned, lead to subtle discrimination that may be difficult to detect on a case-by-case basis.

We believe that Congress' chosen remedy, the family-care leave provision of the FMLA, is "congruent and proportional to the targeted violation," *Garrett, supra,* at 374. Congress had already tried unsuccessfully to address this problem through Title VII and the amendment of Title VII by the Pregnancy Discrimination Act, 42 U. S. C. § 2000e(k). Here, as in *Katzenbach, supra,* Congress again confronted a "difficult and intractable proble[m]," *Kimel, supra,* at 88, where previous legislative attempts had failed. See *Katzenbach, supra,* at 313 (upholding the Voting Rights Act). Such problems may justify added prophylactic measures in response. *Kimel, supra,* at 88.

By creating an across-the-board, routine employment benefit for all eligible employees, Congress sought to ensure that family-care leave would no longer be stigmatized as an inordinate drain on the workplace caused by female employees, and that employers could not evade leave obligations simply by hiring men. By setting a minimum standard of family leave for *all* eligible employees, irrespective of gender, the FMLA attacks the formerly state-sanctioned stereotype that only women are responsible for family caregiving, thereby reducing employers' incentives to engage in discrimination by basing hiring and promotion decisions on stereotypes.

The dissent characterizes the FMLA as a "substantive entitlement program" rather than a remedial statute because it establishes a floor of 12 weeks' leave. *Post,* at 754. In the dissent's view, in the face of evidence of gender-based discrimination by the States in the provision of leave benefits, Congress could do no more in exercising its § 5 power than simply proscribe such discrimination. But this position cannot be squared with our recognition that Congress "is not confined to the enactment of legislation that merely parrots the precise wording of the Fourteenth Amendment," but may prohibit "a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Kimel, supra,* at 81. For example, this Court has

upheld certain prophylactic provisions of the Voting Rights Act as valid exercises of Congress' §5 power, including the literacy test ban and preclearance requirements for changes in States' voting procedures. See, *e. g., Katzenbach* v. *Morgan,* 384 U. S. 641 (1966); *Oregon* v. *Mitchell,* 400 U. S. 112 (1970); *South Carolina* v. *Katzenbach, supra.*

Indeed, in light of the evidence before Congress, a statute mirroring Title VII, that simply mandated gender equality in the administration of leave benefits, would not have achieved Congress' remedial object. Such a law would allow States to provide for no family leave at all. Where "[t]wo-thirds of the nonprofessional caregivers for older, chronically ill, or disabled persons are working women," H. R. Rep. No. 103–8, pt. 1, at 24; S. Rep. No. 103–3, at 7, and state practices continue to reinforce the stereotype of women as caregivers, such a policy would exclude far more women than men from the workplace.

Unlike the statutes at issue in *City of Boerne, Kimel,* and *Garrett,* which applied broadly to every aspect of state employers' operations, the FMLA is narrowly targeted at the faultline between work and family—precisely where sex-based overgeneralization has been and remains strongest— and affects only one aspect of the employment relationship. Compare *Ragsdale* v. *Wolverine World Wide, Inc.,* 535 U. S. 81, 91 (2002) (discussing the "important limitations of the [FMLA's] remedial scheme"), with *City of Boerne,* 521 U. S., at 532 (the "[s]weeping coverage" of the Religious Freedom Restoration Act of 1993); *Kimel,* 528 U. S., at 91 ("the indiscriminate scope of the [ADEA's] substantive requirements"); and *Garrett,* 531 U. S., at 361 (the ADA prohibits disability discrimination "in regard to [any] terms, conditions, and privileges of employment" (internal quotation marks omitted)).

We also find significant the many other limitations that Congress placed on the scope of this measure. See *Florida Prepaid,* 527 U. S., at 647 ("[W]here 'a congressional enact-

ment pervasively prohibits constitutional state action in an effort to remedy or to prevent unconstitutional state action, limitations of this kind tend to ensure Congress' means are proportionate to ends legitimate under §5'" (quoting *City of Boerne, supra,* at 532–533)). The FMLA requires only unpaid leave, 29 U. S. C. §2612(a)(1), and applies only to employees who have worked for the employer for at least one year and provided 1,250 hours of service within the last 12 months, §2611(2)(A). Employees in high-ranking or sensitive positions are simply ineligible for FMLA leave; of particular importance to the States, the FMLA expressly excludes from coverage state elected officials, their staffs, and appointed policymakers. §§2611(2)(B)(i) and (3), 203(e)(2)(C). Employees must give advance notice of foreseeable leave, §2612(e), and employers may require certification by a health care provider of the need for leave, §2613. In choosing 12 weeks as the appropriate leave floor, Congress chose "a middle ground, a period long enough to serve 'the needs of families' but not so long that it would upset 'the legitimate interests of employers.'" *Ragsdale, supra,* at 94 (quoting 29 U. S. C. §2601(b)).[12] Moreover, the cause

---

[12] Congress established 12 weeks as a floor, thus leaving States free to provide their employees with more family-leave time if they so choose. See 29 U. S. C. §2651(b) ("Nothing in this Act or any amendment made by this Act shall be construed to supersede any provision of any State or local law that provides greater family or medical leave rights than the rights established under this Act or any amendment made by this Act"). The dissent faults Congress for giving States this choice, arguing that the FMLA's terms do not bar States from granting more family-leave time to women than to men. *Post,* at 756. But JUSTICE KENNEDY effectively counters his own argument in his very next breath, recognizing that such gender-based discrimination would "run afoul of the Equal Protection Clause or Title VII." *Ibid.* In crafting new legislation to remedy unconstitutional state conduct, Congress may certainly rely on and take account of existing laws. Indeed, Congress expressly did so here. See 29 U. S. C. §2651(a) ("Nothing in this Act or any amendment made by this Act shall be construed to modify or affect any Federal or State law prohibiting discrimination on the basis of . . . sex . . .").

of action under the FMLA is a restricted one: The damages recoverable are strictly defined and measured by actual monetary losses, §§ 2617(a)(1)(A)(i)–(iii), and the accrual period for backpay is limited by the Act's 2-year statute of limitations (extended to three years only for willful violations), §§ 2617(c)(1) and (2).

For the above reasons, we conclude that § 2612(a)(1)(C) is congruent and proportional to its remedial object, and can "be understood as responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne, supra,* at 532.

The judgment of the Court of Appeals is therefore

*Affirmed.*

JUSTICE SOUTER, with whom JUSTICE GINSBURG and JUSTICE BREYER join, concurring.

Even on this Court's view of the scope of congressional power under § 5 of the Fourteenth Amendment, see *Board of Trustees of Univ. of Ala.* v. *Garrett,* 531 U. S. 356 (2001); *Kimel* v. *Florida Bd. of Regents,* 528 U. S. 62 (2000); *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank,* 527 U. S. 627 (1999), the Family and Medical Leave Act of 1993 is undoubtedly valid legislation, and application of the Act to the States is constitutional; the same conclusions follow *a fortiori* from my own understanding of § 5, see *Garrett, supra,* at 376 (BREYER, J., dissenting); *Kimel, supra,* at 92 (STEVENS, J., dissenting); *Florida Prepaid, supra,* at 648 (STEVENS, J., dissenting); see also *Katzenbach* v. *Morgan,* 384 U. S. 641, 650–651 (1966). I join the Court's opinion here without conceding the dissenting positions just cited or the dissenting views expressed in *Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44, 100 (1996) (SOUTER, J., dissenting).

JUSTICE STEVENS, concurring in the judgment.

Because I have never been convinced that an Act of Congress can amend the Constitution and because I am uncer-

tain whether the congressional enactment before us was truly "'needed to secure the guarantees of the Fourteenth Amendment,'" I write separately to explain why I join the Court's judgment. *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 458 (1976) (STEVENS, J., concurring in judgment) (quoting *Katzenbach* v. *Morgan*, 384 U. S. 641, 651 (1966)).

The plain language of the Eleventh Amendment poses no barrier to the adjudication of this case because respondents are citizens of Nevada. The sovereign immunity defense asserted by Nevada is based on what I regard as the second Eleventh Amendment, which has its source in judge-made common law, rather than constitutional text. *Pennsylvania* v. *Union Gas Co.*, 491 U. S. 1, 23 (1989) (STEVENS, J., concurring). As long as it clearly expresses its intent, Congress may abrogate that common-law defense pursuant to its power to regulate commerce "among the several States." U. S. Const., Art. I, § 8. The family-care provision of the Family and Medical Leave Act of 1993 is unquestionably a valid exercise of a power that is "broad enough to support federal legislation regulating the terms and conditions of state employment." *Fitzpatrick*, 427 U. S., at 458 (STEVENS, J., concurring in judgment).* Accordingly, Nevada's sovereign immunity defense is without merit.

JUSTICE SCALIA, dissenting.

I join JUSTICE KENNEDY's dissent, and add one further observation: The constitutional violation that is a prerequisite to "prophylactic" congressional action to "enforce" the Fourteenth Amendment is a violation *by the State against which the enforcement action is taken.* There is no guilt by association, enabling the sovereignty of one State to be abridged under § 5 of the Fourteenth Amendment because of violations by another State, or by most other States, or even

---

*See Stevens, "Two Questions About Justice," 2003 U. Ill. L. Rev. 821 (discussing *Fitzpatrick*).

by 49 other States. We explained as much long ago in the *Civil Rights Cases*, 109 U. S. 3, 14 (1883), which invalidated a portion of the Civil Rights Act of 1875, purportedly based on § 5, in part for the following reason:

> "It applies equally to cases arising in states which have the justest laws respecting the personal rights of citizens, and whose authorities are ever ready to enforce such laws as to those which arise in states that may have violated the prohibition of the amendment."

Congress has sometimes displayed awareness of this self-evident limitation. That is presumably why the most sweeping provisions of the Voting Rights Act of 1965—which we upheld in *City of Rome* v. *United States*, 446 U. S. 156 (1980), as a valid exercise of congressional power under § 2 of the Fifteenth Amendment*—were restricted to States "with a demonstrable history of intentional racial discrimination in voting," *id.*, at 177.

Today's opinion for the Court does not even attempt to demonstrate that each one of the 50 States covered by 29 U. S. C. § 2612(a)(1)(C) was in violation of the Fourteenth Amendment. It treats "the States" as some sort of collective entity which is guilty or innocent as a body. "[T]he States' record of unconstitutional participation in, and fostering of, gender-based discrimination," it concludes, "is weighty enough to justify the enactment of prophylactic § 5 legislation." *Ante*, at 735. This will not do. Prophylaxis in the sense of extending the remedy beyond the violation is one thing; prophylaxis in the sense of extending the remedy beyond the violator is something else. See *City of Rome, supra*, at 177 ("Congress could rationally have concluded

---

*Section 2 of the Fifteenth Amendment is practically identical to § 5 of the Fourteenth Amendment. Compare Amdt. 14, § 5 ("The Congress shall have power to enforce, by appropriate legislation, the provisions of this article"), with Amdt. 15, § 2 ("The Congress shall have power to enforce this article by appropriate legislation").

that, because electoral changes *by jurisdictions with a demonstrable history of intentional racial discrimination* in voting create the risk of purposeful discrimination, it was proper to prohibit changes that have a discriminatory impact" (emphasis added)).

When a litigant claims that legislation has denied him individual rights secured by the Constitution, the court ordinarily asks first whether the legislation is constitutional *as applied to him.* See *Broadrick* v. *Oklahoma,* 413 U. S. 601, 613 (1973). When, on the other hand, a federal statute is challenged as going beyond Congress's enumerated powers, under our precedents the court first asks whether the statute is unconstitutional *on its face. Ante,* at 727–728; *Post,* at 744 (KENNEDY, J., dissenting); see *United States* v. *Morrison,* 529 U. S. 598 (2000); *City of Boerne* v. *Flores,* 521 U. S. 507 (1997); *United States* v. *Lopez,* 514 U. S. 549 (1995). If the statute survives this challenge, however, it stands to reason that the court may, if asked, proceed to analyze whether the statute (constitutional on its face) can be validly applied to the litigant. In the context of § 5 prophylactic legislation applied against a State, this would entail examining whether the State has itself engaged in discrimination sufficient to support the exercise of Congress's prophylactic power.

It seems, therefore, that for purposes of defeating petitioners' challenge, it would have been enough for respondents to demonstrate that § 2612(a)(1)(C) was *facially* valid—*i. e.,* that it could constitutionally be applied to *some* jurisdictions. See *United States* v. *Salerno,* 481 U. S. 739, 745 (1987). (Even that demonstration, for the reasons set forth by JUSTICE KENNEDY, has not been made.) But when it comes to an as-applied challenge, I think Nevada will be entitled to assert that the mere facts that (1) it is a State, and (2) some States are bad actors, is not enough; it can demand that *it* be shown to have been acting in violation of the Fourteenth Amendment.

JUSTICE KENNEDY, with whom JUSTICE SCALIA and JUSTICE THOMAS join, dissenting.

The Family and Medical Leave Act of 1993 makes explicit the congressional intent to invoke § 5 of the Fourteenth Amendment to abrogate state sovereign immunity and allow suits for money damages in federal courts. *Ante,* at 726–727, and n. 1. The specific question is whether Congress may impose on the States this entitlement program of its own design, with mandated minimums for leave time, and then enforce it by permitting private suits for money damages against the States. This in turn must be answered by asking whether subjecting States and their treasuries to monetary liability at the insistence of private litigants is a congruent and proportional response to a demonstrated pattern of unconstitutional conduct by the States. See *ante,* at 728; *Board of Trustees of Univ. of Ala.* v. *Garrett,* 531 U. S. 356, 365 (2001); *City of Boerne* v. *Flores,* 521 U. S. 507, 520 (1997). If we apply the teaching of these and related cases, the family leave provision of the Act, 29 U. S. C. § 2612(a)(1)(C), in my respectful view, is invalid to the extent it allows for private suits against the unconsenting States.

Congress does not have authority to define the substantive content of the Equal Protection Clause; it may only shape the remedies warranted by the violations of that guarantee. *City of Boerne, supra,* at 519–520. This requirement has special force in the context of the Eleventh Amendment, which protects a State's fiscal integrity from federal intrusion by vesting the States with immunity from private actions for damages pursuant to federal laws. The Commerce Clause likely would permit the National Government to enact an entitlement program such as this one; but when Congress couples the entitlement with the authorization to sue the States for monetary damages, it blurs the line of accountability the State has to its own citizens. These basic concerns underlie cases such as *Garrett* and *Kimel* v. *Florida Bd. of Regents,* 528 U. S. 62 (2000), and should counsel far

more caution than the Court shows in holding § 2612(a)(1)(C) is somehow a congruent and proportional remedy to an identified pattern of discrimination.

The Court is unable to show that States have engaged in a pattern of unlawful conduct which warrants the remedy of opening state treasuries to private suits. The inability to adduce evidence of alleged discrimination, coupled with the inescapable fact that the federal scheme is not a remedy but a benefit program, demonstrates the lack of the requisite link between any problem Congress has identified and the program it mandated.

In examining whether Congress was addressing a demonstrated "pattern of unconstitutional employment discrimination by the States," the Court gives superficial treatment to the requirement that we "identify with some precision the scope of the constitutional right at issue." *Garrett, supra,* at 365, 368. The Court suggests the issue is "the right to be free from gender-based discrimination in the workplace," *ante,* at 728, and then it embarks on a survey of our precedents speaking to "[t]he history of the many state laws limiting women's employment opportunities," *ante,* at 729. All would agree that women historically have been subjected to conditions in which their employment opportunities are more limited than those available to men. As the Court acknowledges, however, Congress responded to this problem by abrogating States' sovereign immunity in Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e-2(a). *Ante,* at 729; see also *Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976). The provision now before us, 29 U. S. C. § 2612(a)(1)(C), has a different aim than Title VII. It seeks to ensure that eligible employees, irrespective of gender, can take a minimum amount of leave time to care for an ill relative.

The relevant question, as the Court seems to acknowledge, is whether, notwithstanding the passage of Title VII and similar state legislation, the States continued to engage in widespread discrimination on the basis of gender in the pro-

vision of family leave benefits. *Ante,* at 730. If such a pattern were shown, the Eleventh Amendment would not bar Congress from devising a congruent and proportional remedy. The evidence to substantiate this charge must be far more specific, however, than a simple recitation of a general history of employment discrimination against women. When the federal statute seeks to abrogate state sovereign immunity, the Court should be more careful to insist on adherence to the analytic requirements set forth in its own precedents. Persisting overall effects of gender-based discrimination at the workplace must not be ignored; but simply noting the problem is not a substitute for evidence which identifies some real discrimination the family leave rules are designed to prevent.

Respondents fail to make the requisite showing. The Act's findings of purpose are devoid of any discussion of the relevant evidence. See *Lizzi* v. *Alexander,* 255 F. 3d 128, 135 (CA4 2001) ("In making [its] finding of purpose, Congress did not identify, as it is required to do, any pattern of gender discrimination by the states with respect to the granting of employment leave for the purpose of providing family or medical care"); see also *Chittister* v. *Department of Community and Econ. Dev.,* 226 F. 3d 223, 228–229 (CA3 2000) ("Notably absent is any finding concerning the existence, much less the prevalence, in public employment of personal sick leave practices that amounted to intentional gender discrimination in violation of the Equal Protection Clause").

As the Court seems to recognize, the evidence considered by Congress concerned discriminatory practices of the private sector, not those of state employers. *Ante,* at 730–731, n. 3. The statistical information compiled by the Bureau of Labor Statistics (BLS), which are the only factual findings the Court cites, surveyed only private employers. *Ante,* at 730. While the evidence of discrimination by private entities may be relevant, it does not, by itself, justify the abrogation of States' sovereign immunity. *Garrett,* 531

U. S., at 368 ("Congress' § 5 authority is appropriately exercised only in response to state transgressions").

The Court seeks to connect the evidence of private discrimination to an alleged pattern of unconstitutional behavior by States through inferences drawn from two sources. The first is testimony by Meryl Frank, Director of the Infant Care Leave Project, Yale Bush Center in Child Development and Social Policy, who surveyed both private and public employers in all 50 States and found little variation between the leave policies in the two sectors. *Ante,* at 730–731, n. 3 (citing The Parental and Medical Leave Act of 1986: Joint Hearing before the Subcommittee on Labor-Management Relations and the Subcommittee on Labor Standards of the House Committee on Education and Labor, 99th Cong., 2d Sess., 33 (1986) (hereinafter Joint Hearing)). The second is a view expressed by the Washington Council of Lawyers that even " '[w]here child-care leave policies do exist, men, *both in the public and private sectors,* receive notoriously discriminatory treatment in their requests for such leave.' " *Ante,* at 731 (quoting Joint Hearing 147) (emphasis added by the Court).

Both statements were made during the hearings on the proposed 1986 national leave legislation, and so preceded the Act by seven years. The 1986 bill, which was not enacted, differed in an important respect from the legislation Congress eventually passed. That proposal sought to provide parenting leave, not leave to care for another ill family member. Compare H. R. 4300, 99th Cong., 2d Sess., §§ 102(3), 103(a) (1986), with 29 U. S. C. § 2612(a)(1)(C). See also L. Gladstone, Congressional Research Service Issue Brief, Family and Medical Leave Legislation, pp. 4–5, 10 (Oct. 26, 1995); Tr. of Oral Arg. 43 (statement of counsel for the United States that "the first time that the family leave was introduced and the first time the section (5) authority was invoked was in H. R. 925," which was proposed in 1987). The testimony on which the Court relies concerned the discrimination

with respect to the parenting leave. See Joint Hearing 31 (statement of Meryl Frank) (the Yale Bush study "evalu- ate[d] the impact of the changing composition of the work- place on families with infants"); *id.*, at 147 (statement of the Washington Council of Lawyers) ("[F]or the first time, *child- care* responsibilities of *both* natural and adoptive mothers *and* fathers will be legislatively protected"). Even if this isolated testimony could support an inference that private sector's gender-based discrimination in the provision of par- enting leave was parallel to the behavior by state actors in 1986, the evidence would not be probative of the States' con- duct some seven years later with respect to a statutory pro- vision conferring a different benefit. The Court of Appeals admitted as much: "We recognize that a weakness in this evidence as applied to Hibbs' case is that the BLS and Yale Bush Center studies deal only with parental leave, not with leave to care for a sick family member. They thus do not document a widespread pattern of precisely the kind of dis- crimination that § 2612(a)(1)(C) is intended to prevent." 273 F. 3d 844, 859 (CA9 2001).

The Court's reliance on evidence suggesting States pro- vided men and women with the parenting leave of different length, *ante*, at 731, and n. 5, suffers from the same flaw. This evidence concerns the Act's grant of parenting leave, §§ 2612(a)(1)(A), (B), and is too attenuated to justify the fam- ily leave provision. The Court of Appeals' conclusion to the contrary was based on an assertion that "if states discrimi- nate along gender lines regarding the one kind of leave, then they are likely to do so regarding the other." 273 F. 3d, at 859. The charge that a State has engaged in a pattern of unconstitutional discrimination against its citizens is a most serious one. It must be supported by more than conjecture.

The Court maintains the evidence pertaining to the par- enting leave is relevant because both parenting and family leave provisions respond to "the same gender stereotype: that women's family duties trump those of the workplace."

*Ante*, at 732, n. 5. This sets the contours of the inquiry at too high a level of abstraction. The question is not whether the family leave provision is a congruent and proportional response to general gender-based stereotypes in employment which "ha[ve] historically produced discrimination in the hiring and promotion of women," *ibid.;* the question is whether it is a proper remedy to an alleged pattern of unconstitutional discrimination by States in the grant of family leave. The evidence of gender-based stereotypes is too remote to support the required showing.

The Court next argues that "even where state laws and policies were not facially discriminatory, they were applied in discriminatory ways." *Ante*, at 732. This charge is based on an allegation that many States did not guarantee the right to family leave by statute, instead leaving the decision up to individual employers, who could subject employees to "'discretionary and possibly unequal treatment.'" *Ibid.* (quoting H. R. Rep. No. 103–8, pt. 2, pp. 10–11 (1993)). The study from which the Court derives this conclusion examined "the parental leave policies of Federal executive branch agencies," H. R. Rep. No. 103–8, at 10, not those of the States. The study explicitly stated that its conclusions concerned federal employees: "'[I]n the absence of a national minimum standard for granting leave for parental purposes, the authority to grant leave and to arrange the length of that leave rests with individual supervisors, leaving Federal employees open to discretionary and possibly unequal treatment.'" *Id.*, at 10–11. A history of discrimination on the part of the Federal Government may, in some situations, support an inference of similar conduct by the States, but the Court does not explain why the inference is justified here.

Even if there were evidence that individual state employers, in the absence of clear statutory guidelines, discriminated in the administration of leave benefits, this circumstance alone would not support a finding of a state-sponsored pattern of discrimination. The evidence could perhaps sup-

port the charge of disparate impact, but not a charge that States have engaged in a pattern of intentional discrimination prohibited by the Fourteenth Amendment. *Garrett*, 531 U. S., at 372–373 (citing *Washington* v. *Davis*, 426 U. S. 229, 239 (1976)).

The federal-state equivalence upon which the Court places such emphasis is a deficient rationale at an even more fundamental level, however; for the States appear to have been ahead of Congress in providing gender-neutral family leave benefits. Thirty States, the District of Columbia, and Puerto Rico had adopted some form of family-care leave in the years preceding the Act's adoption. The reports in both Houses of Congress noted this fact. H. R. Rep. No. 103–8, at 32–33; S. Rep. No. 103–3, pp. 20–21 (1993); see also Brief for State of Alabama et al. as *Amici Curiae* 18–22. Congressional hearings noted that the provision of family leave was "an issue which has picked up tremendous momentum in the States, with some 21 of them having some form of family or medical leave on the books." The Family and Medical Leave Act of 1991: Hearing on H. R. 2 before the Subcommittee on Labor-Management Relations of the House Committee on Education and Labor, 102d Cong., 1st Sess., p. 4 (1991) (statement of Rep. Marge Roukema). Congress relied on the experience of the States in designing the national leave policy to be cost effective and gender neutral. S. Rep. No. 103–3, at 12–14; The Parental and Medical Leave Act of 1987: Hearings on S. 249 before the Subcommittee on Children, Family, Drugs and Alcoholism of the Senate Committee on Labor and Human Resources, 100th Cong., 1st Sess., pt. 2, pp. 194–195, 533–534 (1987). Congress also acknowledged that many States had implemented leave policies more generous than those envisioned by the Act. H. R. Rep. No. 103–8, pt. 1, at 50; S. Rep. No. 103–3, at 38. At the very least, the history of the Act suggests States were in the process of solving any existing gender-based discrimination in the provision of family leave.

The Court acknowledges that States have adopted family leave programs prior to federal intervention, but argues these policies suffered from serious imperfections. *Ante,* at 733–734. Even if correct, this observation proves, at most, that programs more generous and more effective than those operated by the States were feasible. That the States did not devise the optimal programs is not, however, evidence that the States were perpetuating unconstitutional discrimination. Given that the States assumed a pioneering role in the creation of family leave schemes, it is not surprising these early efforts may have been imperfect. This is altogether different, however, from purposeful discrimination.

The Court's lengthy discussion of the allegedly deficient state policies falls short of meeting this standard. A great majority of these programs exhibit no constitutional defect and, in fact, are authorized by this Court's precedent. The Court points out that seven States adopted leave provisions applicable only to women. *Ante,* at 733. Yet it must acknowledge that three of these schemes concerned solely pregnancy disability leave. *Ante,* at 733, n. 6 (citing 3 Colo. Code Regs. § 708–1, Rule 80.8 (2002); Iowa Code § 216.6(2) (2000); N. H. Stat. Ann. § 354–A:7(VI)(b) (Michie Supp. 2000)). Our cases make clear that a State does not violate the Equal Protection Clause by granting pregnancy disability leave to women without providing for a grant of parenting leave to men. *Geduldig* v. *Aiello,* 417 U. S. 484, 496–497, n. 20 (1974); see also Tr. of Oral Arg. 49 (counsel for the United States conceding that *Geduldig* would permit this practice). The Court treats the pregnancy disability scheme of the fourth State, Louisiana, as a disguised gender-discriminatory provision of parenting leave because the scheme would permit leave in excess of the period Congress believed to be medically necessary for pregnancy disability. *Ante,* at 733, n. 6. The Louisiana statute, however, granted leave only for "that period during which the female employee is disabled on account of pregnancy, child-

birth, or related medical conditions." La. Stat. Ann. § 23:1008(A)(2)(b) (West Supp. 1993) (repealed 1997). Properly administered, the scheme, despite its generous maximum, would not transform into a discriminatory "4-month maternity leave for female employees only." *Ante*, at 733, n. 6.

The Court next observes that 12 States "provided their employees no family leave, beyond an initial childbirth or adoption." *Ante*, at 733. Four of these States are those which, as discussed above, offered pregnancy disability leave only. See *ante*, at 733, n. 7 (citing 3 Colo. Code Regs. § 708–1, Rule 80.8 (2002); Iowa Code § 216.6(2) (2000); La. Stat. Ann. § 23:1008(A)(2) (West Supp. 1993) (repealed 1997); N. H. Stat. Ann. § 354–A:7(VI)(b) (Michie Supp. 2000)). Of the remaining eight States, five offered parenting leave to both men and women on an equal basis; a practice which no one contends suffers from a constitutional infirmity. See *ante*, at 733–734, n. 7 (citing Del. Code Ann., Tit. 29, § 5116 (1997); Ky. Rev. Stat. Ann. § 337.015 (Michie 2001); Mo. Rev. Stat. § 105.271 (2000); N. Y. Lab. Law § 201–c (West 2002); U. S. Dept. of Labor, Women's Bureau, State Maternity/ Family Leave Law, p. 12 (June 1993) (discussing the policy adopted by the Virginia Department of Personnel and Training)). The Court does not explain how the provision of social benefits either on a gender-neutral level (as with the parenting leave) or in a way permitted by this Court's case law (as with the pregnancy disability leave) offends the Constitution. Instead, the Court seems to suggest that a pattern of unconstitutional conduct may be inferred solely because a State, in providing its citizens with social benefits, does not make these benefits as generous or extensive as Congress would later deem appropriate.

The Court further chastises the States for having "provided no statutorily guaranteed right to family leave, offering instead only voluntary or discretionary leave programs." *Ante*, at 733–734; see also *ante*, at 734 ("[F]our States pro-

vided leave only through administrative regulations or personnel policies"). The Court does not argue the States intended to enable employers to discriminate in the provision of family leave; nor, as already noted, is there evidence state employers discriminated in the administration of leave benefits. See *supra,* at 749–750. Under the Court's reasoning, Congress seems justified in abrogating state immunity from private suits whenever the State's social benefits program is not enshrined in the statutory code and provides employers with discretion.

Stripped of the conduct which exhibits no constitutional infirmity, the Court's "exten[sive] and specifi[c] . . . record of unconstitutional state conduct," *ante,* at 735, n. 11, boils down to the fact that three States, Massachusetts, Kansas, and Tennessee, provided parenting leave only to their female employees, and had no program for granting their employees (male or female) family leave. See *ante,* at 733–734, nn. 6 and 7 (citing Mass. Gen. Laws, ch. 149, § 105D (West 1997); Kan. Admin. Regs. 21–32–6(d) (2003); Tenn. Code Ann. § 4–21–408(a) (1998)). As already explained, *supra,* at 748–749, the evidence related to the parenting leave is simply too attenuated to support a charge of unconstitutional discrimination in the provision of family leave. Nor, as the Court seems to acknowledge, does the Constitution require States to provide their employees with any family leave at all. *Ante,* at 738. A State's failure to devise a family leave program is not, then, evidence of unconstitutional behavior.

Considered in its entirety, the evidence fails to document a pattern of unconstitutional conduct sufficient to justify the abrogation of States' sovereign immunity. The few incidents identified by the Court "fall far short of even suggesting the pattern of unconstitutional discrimination on which § 5 legislation must be based." *Garrett,* 531 U. S., at 370; see also *Kimel,* 528 U. S., at 89–91; *City of Boerne,* 521 U. S., at 530–531. Juxtaposed to this evidence is the States' record of addressing gender-based discrimination in the provi-

sion of leave benefits on their own volition. See generally Brief for State of Alabama et al. as *Amici Curiae* 5–14.

Our concern with gender discrimination, which is subjected to heightened scrutiny, as opposed to age- or disability-based distinctions, which are reviewed under rational standard, see *Kimel, supra,* at 83–84; *Garrett, supra,* at 366–367, does not alter this conclusion. The application of heightened scrutiny is designed to ensure gender-based classifications are not based on the entrenched and pervasive stereotypes which inhibit women's progress in the workplace. *Ante,* at 736. This consideration does not divest respondents of their burden to show that "Congress identified a history and pattern of unconstitutional employment discrimination by the States." *Garrett, supra,* at 368. The Court seems to reaffirm this requirement. *Ante,* at 729 ("We now inquire whether Congress had evidence of a pattern of constitutional violations on the part of the States . . ."); see also *ante,* at 735 ("[T]he States' record of unconstitutional participation in, and fostering of, gender-based discrimination in the administration of leave benefits is weighty enough to justify the enactment of prophylactic § 5 legislation"). In my submission, however, the Court does not follow it. Given the insufficiency of the evidence that States discriminated in the provision of family leave, the unfortunate fact that stereotypes about women continue to be a serious and pervasive social problem would not alone support the charge that a State has engaged in a practice designed to deny its citizens the equal protection of the laws. *Garrett, supra,* at 369.

The paucity of evidence to support the case the Court tries to make demonstrates that Congress was not responding with a congruent and proportional remedy to a perceived course of unconstitutional conduct. Instead, it enacted a substantive entitlement program of its own. If Congress had been concerned about different treatment of men and women with respect to family leave, a congruent remedy

would have sought to ensure the benefits of any leave program enacted by a State are available to men and women on an equal basis. Instead, the Act imposes, across the board, a requirement that States grant a minimum of 12 weeks of leave per year. 29 U. S. C. § 2612(a)(1)(C). This requirement may represent Congress' considered judgment as to the optimal balance between the family obligations of workers and the interests of employers, and the States may decide to follow these guidelines in designing their own family leave benefits. It does. not follow, however, that if the States choose to enact a different benefit scheme, they should be deemed to engage in unconstitutional conduct and forced to open their treasuries to private suits for damages.

Well before the federal enactment, Nevada not only provided its employees, on a gender-neutral basis, with an option of requesting up to one year of unpaid leave, Nev. Admin. Code § 284.578(1) (1984), but also permitted, subject to approval and other conditions, leaves of absence in excess of one year, § 284.578(2). Nevada state employees were also entitled to use up to 10 days of their accumulated paid sick leave to care for an ill relative. § 284.558(1). Nevada, in addition, had a program of special "catastrophic leave." State employees could donate their accrued sick leave to a general fund to aid employees who needed additional leave to care for a relative with a serious illness. Nev. Rev. Stat. § 284.362(1) (1995).

To be sure, the Nevada scheme did not track that devised by the Act in all respects. The provision of unpaid leave was discretionary and subject to a possible reporting requirement. Nev. Admin. Code § 284.578(2)(3) (1984). A congruent remedy to any discriminatory exercise of discretion, however, is the requirement that the grant of leave be administered on a gender-equal basis, not the displacement of the State's scheme by a federal one. The scheme enacted by the Act does not respect the States' autonomous power to design their own social benefits regime.

Were more proof needed to show that this is an entitlement program, not a remedial statute, it should suffice to note that the Act does not even purport to bar discrimination in some leave programs the States do enact and administer. Under the Act, a State is allowed to provide women with, say, 24 weeks of family leave per year but provide only 12 weeks of leave to men. As the counsel for the United States conceded during the argument, a law of this kind might run afoul of the Equal Protection Clause or Title VII, but it would not constitute a violation of the Act. Tr. of Oral Arg. 49. The Act on its face is not drawn as a remedy to gender-based discrimination in family leave.

It has been long acknowledged that federal legislation which "deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." *City of Boerne*, 521 U. S., at 518; see also *ante*, at 737 (in exercising its power under §5 of the Fourteenth Amendment, Congress "may prohibit 'a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text'" (quoting *Kimel*, 528 U. S., at 81)). The Court has explained, however, that Congress may not "enforce a constitutional right by changing what the right is." *City of Boerne, supra,* at 519. The dual requirement that Congress identify a pervasive pattern of unconstitutional state conduct and that its remedy be proportional and congruent to the violation is designed to separate permissible exercises of congressional power from instances where Congress seeks to enact a substantive entitlement under the guise of its §5 authority.

The Court's precedents upholding the Voting Rights Act of 1965 as a proper exercise of Congress' remedial power are instructive. In *South Carolina* v. *Katzenbach*, 383 U. S. 301 (1966), the Court concluded that the Voting Rights Act's prohibition on state literacy tests was an appropriate method of enforcing the constitutional protection against racial dis-

crimination in voting. This measure was justified because "Congress documented a marked pattern of unconstitutional action by the States." *Garrett*, 531 U. S., at 373 (citing *Katzenbach, supra*, at 312, 313); see also *City of Boerne, supra*, at 525 ("We noted evidence in the record reflecting the subsisting and pervasive discriminatory—and therefore unconstitutional—use of literacy tests" (citing *Katzenbach, supra*, at 333–334)). Congress' response was a "limited remedial scheme designed to guarantee meaningful enforcement of the Fifteenth Amendment." *Garrett, supra*, at 373. This scheme was both congruent, because it "aimed at areas where voting discrimination has been most flagrant," *Katzenbach*, 383 U. S., at 315, and proportional, because it was necessary to "banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century," *id.*, at 308. The Court acknowledged Congress' power to devise "strong remedial and preventive measures" to safeguard voting rights on subsequent occasions, but always explained that these measures were legitimate because they were responding to a pattern of "the widespread and persisting deprivation of constitutional rights resulting from this country's history of racial discrimination." *City of Boerne, supra*, at 526–527 (citing *Oregon* v. *Mitchell*, 400 U. S. 112 (1970); *City of Rome* v. *United States*, 446 U. S. 156 (1980); *Katzenbach* v. *Morgan*, 384 U. S. 641 (1966)).

This principle of our § 5 jurisprudence is well illustrated not only by the Court's opinions in these cases but also by the late Justice Harlan's dissent in *Katzenbach* v. *Morgan*. There, Justice Harlan contrasted his vote to invalidate a federal ban on New York state literacy tests from his earlier decision, in *South Carolina* v. *Katzenbach*, to uphold stronger remedial measures against the State of South Carolina, such as suspension of literacy tests, imposition of preclearance requirements for any changes in state voting laws, and appointment of federal voting examiners. *Katzenbach*

v. *Morgan, supra,* at 659, 667; see also *South Carolina* v. *Katzenbach, supra,* at 315–323. Justice Harlan explained that in the case of South Carolina there was "'voluminous legislative history' as well as judicial precedents supporting the basic congressional findings that the clear commands of the Fifteenth Amendment had been infringed by various state subterfuges. . . . Given the existence of the evil, we held the remedial steps taken by the legislature under the Enforcement Clause of the Fifteenth Amendment to be a justifiable exercise of congressional initiative." 384 U. S., at 667 (quoting *South Carolina* v. *Katzenbach, supra,* at 309, 329–330). By contrast, the New York case, in his view, lacked a showing that "there has in fact been an infringement of that constitutional command, that is, whether a particular state practice . . . offend[ed] the command of the Equal Protection Clause of the Fourteenth Amendment." 384 U. S., at 667. In the absence of evidence that a State has engaged in unconstitutional conduct, Justice Harlan would have concluded that the literacy test ban Congress sought to impose was not an "appropriate remedial measur[e] to redress and prevent the wrongs," but an impermissible attempt "to define the *substantive* scope of the Amendment." *Id.,* at 666, 668.

For the same reasons, the abrogation of state sovereign immunity pursuant to Title VII was a legitimate congressional response to a pattern of gender-based discrimination in employment. *Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976). The family leave benefit conferred by the Act is, by contrast, a substantive benefit Congress chose to confer upon state employees. See *City of Boerne, supra,* at 520 ("There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect"). The plain truth is Congress did not "ac[t] to accomplish the legitimate end of enforcing judicially-recognized Fourteenth Amendment

rights, [but] instead pursued an object outside the scope of Section Five by imposing new, non-remedial legal obligations on the states." Beck, The Heart of Federalism: Pretext Review of Means-End Relationships, 36 U. C. D. L. Rev. 407, 440 (2003).

It bears emphasis that, even were the Court to bar unconsented federal suits by private individuals for money damages from a State, individuals whose rights under the Act were violated would not be without recourse. The Act is likely a valid exercise of Congress' power under the Commerce Clause, Art. I, § 8, cl. 3, and so the standards it prescribes will be binding upon the States. The United States may enforce these standards in actions for money damages; and private individuals may bring actions against state officials for injunctive relief under *Ex parte Young*, 209 U. S. 123 (1908). What is at issue is only whether the States can be subjected, without consent, to suits brought by private persons seeking to collect moneys from the state treasury. Their immunity cannot be abrogated without documentation of a pattern of unconstitutional acts by the States, and only then by a congruent and proportional remedy. There has been a complete failure by respondents to carry their burden to establish each of these necessary propositions. I would hold that the Act is not a valid abrogation of state sovereign immunity and dissent with respect from the Court's conclusion to the contrary.