PAEZ, Circuit Judge,
dissenting:
I would hold that Congress validly abrogated the States’ Eleventh Amendment immunity to private claims for damages under the Government Employee Rights Act (“GERA”), 42 U.S.C. § 2000e-16a to 16c. I therefore respectfully dissent. Because the majority decides the Eleventh Amendment inquiry on narrow grounds, and because I disagree with its holding, I proceed to address the two predicate inquiries of the immunity analysis: congressional intent and constitutional authority. I turn first to congressional intent.[1]
I. Congressional Intent
To abrogate the States’ Eleventh Amendment immunity, Congress must “unequivocally express[ ] its intent to abrogate that immunity.” Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). In my view, Congress unequivocally expressed such an intent in GERA.
As the Supreme Court explained in 1976 in Fitzpatrick v. Bitzer, Title VII of the Civil Rights Act of 1964 expressly excluded the States from its purview. 427 U.S. 445, 448-49 & n. 2, 96 S.Ct. 2666, 49 L.Ed.2d 614. The 1972 amendments to Title VII,[2] however, “made clear that [Title VII] was being extended to persons aggrieved by public employers.” Id. at 449, n. 2, 96 S.Ct. 2666. With regard to the States, the 1972 amendments extended Title VII’s protections to “employees subject to the civil service laws of a State government, governmental agency or political subdivision.” 42 U.S.C. § 2000e(f). Conversely, the amendments excluded:
any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer’s personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.
Id. The 1972 amendments also changed the definition of “respondent” to include government employers,[3] and thereby expressly subjected the States to private suits for damages by their employees. See Fitzpatrick, 427 U.S. at 448-49 & n. 2, 96 S.Ct. 2666; Okruhlik v. Univ. of Ark., 255 F.3d 615, 623 (8th Cir.2001).
Fitzpatrick therefore concluded that “congressional authorization to sue the *483 State as employer” and “abrogate the immunity conferred by the Eleventh Amendment” was “clearly present” in the 1972 amendments. 427 U.S. at 451-52, 96 S.Ct. 2666 (citation and internal quotation marks omitted); see also Cerrato v. S.F. Cmty. Coll. Dist., 26 F.3d 968, 976 (9th Cir.1994) (“The Supreme Court has held that Congress has abrogated the Eleventh Amendment with respect to Title VII claims.”). The Court also held that Congress validly exercised its authority under § 5 of the Fourteenth Amendment in abrogating the States’ Eleventh Amendment immunity, because Title VTI as amended was “ ‘appropriate legislation’ for the purpose of enforcing the provisions of the Fourteenth Amendment.” Fitzpatrick, 427 U.S. at 456, 96 S.Ct. 2666.
Fifteen years after Fitzpatrick, Congress enacted GERA as part of the Civil Rights Act of 1991 (“1991 Act”), extending Title VTI’s protections to the state employees excluded from the 1972 amendments. The preamble to the 1991 Act states that it is “[a]n Act to amend ” Title VIL Pub.L. No. 102-166, 105 Stat. 1071, 1071 (1991) (emphasis added); see also Okruhlik, 255 F.3d at 623 (“Although the 1991 Act is a separate statutory provision, the preamble makes clear that it was intended to amend Title VIL”). Likewise, the text of GERA clarifies that it was intended to amend and extend Title VII. As originally enacted as Section 321 of the 1991 Act, GERA was titled “Coverage of previously exempt State employees.” 105 Stat. at 1097 (emphasis added); see also 42 U.S.C. § 2000e-16c (GERA statutory provisions, as currently codified, with same title). GERA’s definition of the covered state employees is also virtually identical to the text of the 1972 amendments that excluded these employees:
[T]his title shall apply with respect to employment of any individual chosen or appointed, by a person elected to public office in any State or political subdivision of any State by the qualified voters thereof—
(1) to be a member of the elected official’s personal staff;
(2) to serve the elected official on the policymaking level; or
(3) to serve the elected official as an immediate advisor with respect to the exercise of the constitutional or legal powers of the office.
42 U.S.C. § 2000e-16c(a). As the Tenth Circuit explained in Board of County Commissioners, Fremont County, Colorado v. EEOC (“Fremont County”): “In 1991, Congress enacted GERA, and extended protections against discrimination to previously exempt state employees. In so doing, Congress echoed the exclusionary language of Title VII, specifically extending protections against discrimination ... to previously exempt high-level state employees.” 405 F.3d 840, 844 (10th Cir.2005); see also Brazoria County, Tex. v. EEOC, 391 F.3d 685, 689-90 (5th Cir.2004) (explaining that the GERA provision that prohibits discrimination on the basis of race or sex, 42 U.S.C. § 2000e-16b(a)(1), uses language identical to and expressly incorporates the meaning of the Title VII section that protects most federal employees, id. § 2000e-16).
For these reasons, at least one of our sister circuits has determined that GERA should be understood as amending and extending Title VII. See Fremont County, 405 F.3d at 849 (“GERA was the last step in the sequence of broadening Title VII to provide protections to state employees---In passing the 1972 Title VII amendments and continuing through GERA as part of the Civil Rights Act of 1991, Congress provided an expanding class of state employees with what Congress found were *484 necessary protections from discrimination.”).
In light of these considerations, there can be no serious doubt that Congress expressed its unequivocal intent in GERA to abrogate the States’ Eleventh Amendment immunity. Because the 1991 Act and GERA effectively amended Title VII and extended its protections to certain previously excluded state employees, Congress, in my view, must have intended GERA to incorporate the 1972 amendments’ express inclusion of state employers as possible respondents to private Title VII claims for damages and the Supreme Court’s 1976 holding that the 1972 amendments therefore validly abrogated the States’ Eleventh Amendment immunity. Cf. Fremont County, 405 F.3d at 845 (“We assume that Congress knows the law and legislates in light of federal court precedent.”).
The Eighth Circuit’s decision in Okruh-lik strongly supports this conclusion. In Okruhlik, the court rejected the defendant state university’s argument that “claims of disparate treatment and disparate impact discrimination under Title VII ... are barred by the Eleventh Amendment ... because [Congress] did not make an unmistakably clear expression of its intent to [abrogate the States’ Eleventh Amendment immunity] in the 1972 Act or in the 1991 Act.” 255 F.3d at 621-22. As the Eighth Circuit explained: “Subsequent to Fitzpatrick, this court has consistently held that the 1972 and 1991 Acts abrogated the Eleventh Amendment. Other circuits have reached the same conclusion based on Fitzpatrick.” Id. at 622 (citations omitted) (citing, inter alia, this court’s holding in Cerrato).
Although the Eighth Circuit did not specifically address the GERA provisions of the 1991 Act, it held that Congress manifested an unequivocal intent to abrogate the States’ Eleventh Amendment immunity as to other provisions of the Act. In rejecting the Eleventh Amendment challenge, the court did so, not because these other provisions standing alone expressly provided that the States were subject to private claims for damages, but because Congress intended these provisions to amend and therefore be read in conjunction with Title VII and the 1972 amendments. See Okruhlik, 255 F.3d at 623 (“Although the 1991 amendments do not define ‘respondent,’ the definition of respondent in Title VII includes state employers.”). Likewise here, reading GERA and Title VII in pari materia, Congress unequivocally expressed its intent to abrogate the States’ Eleventh Amendment immunity: GERA extends Title VII to allow previously exempt state employees to pursue private claims for damages against their employers, and Title VII expressly provides that state employers can be defendants to such claims and therefore abrogates the States’ sovereign immunity.
Even examining GERA independent of Title VII, the text of the statute standing alone unequivocally establishes that Congress intended for the States to be defendants to private claims for damages. GERA provides for compensatory but not punitive damages as a remedy for covered “State employees” intentionally discriminated against by any “personnel actions affecting [them].” 42 U.S.C. § 2000e-16b(a)-(b). In theory, there are two possible defendants to such claims: (1) the States; and (2) the individual state agents who engaged in the discriminatory behavior. At the time Congress enacted GERA, however, all but one of the Circuits to address the issue had held that under Title VII’s definition of “employer,” individual defendants could not be held liable for damages.[4] Compare Busby v. City of Or *485 lando, 931 F.2d 764, 772 (11th Cir.1991) (“Individual capacity suits under Title VII are ... inappropriate.”), Padway v. Palches, 665 F.2d 965, 968 (9th Cir.1982) (“The individual defendants cannot be held liable for back pay.”), Clanton v. Orleans Parish Sch. Bd., 649 F.2d 1084, 1099 (5th Cir.1981) (same), and Monell v. Dep’t of Soc. Servs., 532 F.2d 259, 261 (2d Cir.1976), rev’d on other grounds, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (same), with Paroline v. Unisys Corp., 879 F.2d 100, 104 (4th Cir.1989), vacated in part on other grounds, 900 F.2d 27 (4th Cir.1990) (en banc) (holding the opposite).
Although GERA does not define “employer,” Congress must have intended, given this significant circuit court precedent and the similarities between GERA and Title VII, for there to be no individual liability under GERA either. Consequently, the only possible defendants to private claims for damages under GERA are the States. GERA’s damages remedy would therefore be a nullity if Congress had not intended to abrogate the States’ Eleventh Amendment immunity, because covered state employees could not file claims for damages against anyone. This limitation on potential defendants distinguishes the present case from Dellmuth v. Muth, 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989), where the Supreme Court held that Congress did not express its unequivocal intent in the Education of the Handicapped Act to abrogate the States’ Eleventh Amendment immunity. There, the Court held that in light of the statutory text, it was only a “permissible inference” that States would be defendants to private claims for damages. Id. at 232, 109 S.Ct. 2397 (emphasis added). Here, to the contrary, it is a necessary inference that States would be defendants to private claims for damages, because States are the only possible defendants to such claims. It would be absurd to imagine that when Congress expressly provided for these claims, it did not intend for there to be a responsible party against whom relief could be awarded.
For all of the above reasons, I would hold that when Congress enacted GERA as part of the 1991 Act, it unequivocally intended to abrogate the States’ Eleventh Amendment immunity.
II. Valid Exercise of § 5 Power
To abrogate the States’ Eleventh Amendment immunity, Congress must also “act[ ] pursuant to a valid grant of constitutional authority.” See Tennessee v. Lane, 541 U.S. 509, 517, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (internal quotation marks omitted). As the Supreme Court has explained, Congress “can abrogate a State’s sovereign immunity when it does so pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment to enforce the substantive guarantees of that Amendment.” Id. at 518, 124 S.Ct. 1978. Further, Congress “must have a wide berth in devising appropriate remedial and preventative measures for unconstitutional actions” that violate the Fourteenth Amendment. Id. at 520, 124 S.Ct. 1978; see also Kimel, 528 U.S. at 80-81, 120 S.Ct. 631 (“It is for Congress in the first instance to determine whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment, and its conclusions are entitled to much deference.” (alteration and internal quotation marks omitted)).
*486 Congress cannot, however, substantively redefine Fourteenth Amendment rights in exercising its § 5 authority. See Kimel, 529 U.S. at 81, 120 S.Ct. 1119; see also Lane, 541 U.S. at 520, 124 S.Ct. 1978 (“Congress must have wide latitude in determining where [the line between remedial legislation and substantive redefinition of Fourteenth Amendment rights] lies. But ... the distinction exists and must be observed.” (citation and internal quotation marks omitted)). The Court has set forth a test to observe this distinction: “Section 5 legislation is valid if it exhibits ‘a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.’ ” Lane, 541 U.S. at 520, 124 S.Ct. 1978 (quoting City of Boerne v. Flores, 521 U.S. 507, 520, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)). In turn, the Court applies a three-step analysis to determine whether legislation is “congruent and proportional.”
The first step of the analysis is “to identify the constitutional right or rights that Congress sought to enforce when it enacted” the legislation. Id. at 522, 117 S.Ct. 2157; see also Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 365, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (“The first step in applying these now familiar principles is to identify with some precision the scope of the constitutional right at issue.”). Here, in enacting the relevant GERA provisions, Congress sought to exercise its § 5 power to protect the rights of certain state employees under the Equal Protection Clause of the Fourteenth Amendment to be free from discrimination on the basis of race or sex.[5]
The second step in the analysis is to determine whether the legislation validly enforces these constitutional rights, “a question that must be judged with reference to the historical experience which [the legislation] reflects.” Lane, 541 U.S. at 523, 124 S.Ct. 1978 (internal quotation marks omitted). As the Court explained in Garrett, “[o]nce we have determined the metes and bounds of the constitutional right in question, we examine whether Congress identified a history and pattern of unconstitutional ... discrimination.” 531 U.S. at 368, 121 S.Ct. 955. In enacting GERA to provide a remedy to state employees who experience race and gender discrimination, Congress did not need extensive evidence of such discrimination, because race and gender-based classifications are subject to strict and heightened scrutiny respectively. See Lane, 541 U.S. at 528-29, 124 S.Ct. 1978 (“We explained that because the [Family Medical Leave Act (‘FMLA’) ] was targeted at sex-based classifications, which are subject to a heightened standard of judicial scrutiny, ‘it was easier for Congress to show a pattern of state constitutional violations’ than in Garrett or Kimel, both of which concerned legislation that targeted classifications subject to rational-basis review.” (quoting Nev. Dep’t of Human Res. v. Hibbs, 538 U.S. 721, 735-37, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003))). Indeed, in holding that there was not sufficient evidence of age-based discrimination for Congress to validly abrogate the States’ sovereign immunity under the Age Discrimination in Employment Act (“ADEA”), Kimel emphasized that the right at issue did not involve race or gender-based classifications:
Age classifications, unlike governmental conduct based on race or gender, cannot *487 be characterized as so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy. Older persons, again, unlike those who suffer discrimination on the basis of race or gender, have not been subjected to a history of purposeful unequal treatment.
528 U.S. at 83, 120 S.Ct. 631 (emphases added) (citation and internal quotations marks omitted).
In light of this standard, I would hold that the evidence before Congress was more than sufficient for Congress to exercise its § 5 authority to enact GERA and abrogate the States’ Eleventh Amendment immunity. As discussed above, the 1991 Act and GERA extended Title VII’s protections to certain previously excluded state employees. In enacting GERA, Congress was therefore entitled to rely on the extensive evidence from when it enacted the 1972 amendments of widespread employment discrimination by the States on the basis of race and sex. See Fremont County, 405 F.3d at 848 (“[Bjecause GERA’s language concerning previously exempt state employees is identical to that in Title VII’s exclusion, we may accord substantial weight to the legislative history of the cognate Title VII provision in construing [GERA].”).
Specifically, in assessing the evidence before it in 1972, Congress found that “widespread discrimination against minorities exists in State and local government employment, and that the existence of this discrimination is perpetuated by the presence of both institutional and overt discriminatory practices.” H.R.Rep. No. 92-238, at 19 (1971), reprinted in 1972 U.S.C.C.A.N. 2137, 2152. Congress also found that “employment discrimination in State and local governments is more pervasive than in the private sector,” and explained that:
The expansion of Title VII coverage to State and local government employment is firmly embodied in the principles of the Constitution of the United States. The Constitution has recognized that it is inimical to the democratic form of government to allow the existence of discrimination in those bureaucratic systems which most directly affect the daily interactions of this Nation’s citizens.
Id. at 2152, 2154. As the Tenth Circuit therefore concluded in Fremont County, rejecting a Tenth Amendment challenge to GERA: “In passing the 1972 Title VII amendments and continuing through GERA as part of the Civil Rights Act of 1991, Congress provided an expanding class of state employees with what Congress found were necessary protections from discrimination.” 405 F.3d at 849 (emphasis added).
Supreme Court decisions further recognize that race and gender-based employment discrimination by the States persisted at the time Congress enacted GERA. As the Court explained in Hibbs in 2003: “It can hardly be doubted that ... women still face pervasive ... discrimination ... in the job market. According to evidence that was before Congress when it enacted the FMLA [in 1993], States continue to rely on invalid gender stereotypes in the employment context .... ” 538 U.S. at 730, 123 S.Ct. 1972 (alteration, citation, and internal quotation marks omitted). The Court has said the same of work-place discrimination on the basis of race. See Kimel, 528 U.S. at 83, 120 S.Ct. 631 (“[T]hose who suffer discrimination on the basis of race ... have ... been subjected to a history of purposeful unequal treatment.” (internal quotation marks omitted)).
The majority concludes, however, that this evidence of race and gender-based *488 discrimination by the States was insufficient for Congress to validly exercise its § 5 power in enacting GERA. None of the majority’s reasons are convincing. As an initial matter, insofar as the majority suggests that GERA’s extension of Title VII’s protections to elected state officials and their staffs is bad policy, such policy considerations are of course irrelevant to our legal inquiry. It was for Congress alone to decide whether these employees should be protected under Title VII.
The majority also infers from Congress’ decision to exclude from the 1972 amendments the state employees now covered by GERA, that the 1972 “hearings did not establish an existing evil” of state discrimination against these employees. This inference, however, is contrary to the congressional record, which suggests that Congress exempted these state employees because certain Senators were concerned about intruding on state rights, not because there was an absence of evidence of discrimination against these employees. As the Tenth Circuit explained in Fremont County:
In the floor debates on the extension of Title VII protections to state employees, Senator Ervin introduced an amendment to exempt those state employees who were chosen by elected officials or who were close personal advisors to elected officials. In the ensuing debates Senator Allen decried federal government encroachment on the powers of local government that would result. To accommodate these Tenth Amendment concerns, when Congress extended Title VII protections to state employees in 1972 it exempted high-level state employees in recognition of the federalism concerns encompassed in their inclusion. It similarly rejected coverage for congressional employees at that time.
405 F.3d at 848-49 (citations and footnotes omitted) (citing 118 Cong. Rec. 1677, 4096-97, 4483, 4494 (1972)).[6]
Indeed, as the majority recognizes, when Congress found extensive evidence of race and gender-based discrimination by the States in 1972, “the reported instances of discrimination appeared to be across the board.” In holding that this widespread evidence of workplace discrimination by the States is not sufficient evidence of discrimination against the particular state employees covered by GERA, the majority parses it more finely than the Supreme Court and our sister circuits have found appropriate. Notably, although the Supreme Court has generally required evidence of constitutional violations by the States, not just private parties, it has otherwise found evidence of a wide variety of constitutional violations relevant to the Eleventh Amendment inquiry. See Lane, 541 U.S. at 527 n. 16, 124 S.Ct. 1978 (“[Ojur cases have recognized that evidence of constitutional violations on the part of nonstate governmental actors is relevant to the § 5 inquiry.” (emphasis added)); id. (noting that “the evidence before the Congress that enacted the FMLA,” which Hibbs determined was sufficient to abrogate Eleventh Amendment immunity, “related primarily to the practices of private-sector employers and the Federal Government” and “in fact contained little specific evidence of a pattern of unconstitutional discrimination on the part of the States”).
As the Eighth Circuit has explained, the Supreme Court “has generally disallowed *489 remedial legislation founded in Congress’s power under Section 5 of the Fourteenth Amendment in instances where Congress failed to establish and identify the general problem that the legislation was intended to ameliorate.” Maitland v. Univ. of Minn., 260 F.3d 959, 965 n. 5 (8th Cir.2001) (discussing City of Boerne, 521 U.S. at 530-32, 117 S.Ct. 2157, and Kimel, 528 U.S. at 83-86, 120 S.Ct. 631). Conversely, at least where, as here, the remedial legislation protects against discrimination on the basis of classifications subject to heightened or strict scrutiny, and the evidence before Congress established a history of discrimination by the States on the basis of these classifications, the Court has not invalidated such legislation on the ground that the evidence was not exactly or explicitly tailored to the harms that Congress sought to remedy.
Thus, our sister circuits have consistently rejected Eleventh Amendment challenges to specific Title VII protections even where the 1972 findings did not explicitly address the exact type of discrimination at issue. The Eighth and Tenth Circuits, for instance, have upheld Title VII retaliation claims against Eleventh Amendment challenges even though “Congress did not specifically note in the legislative record a widespread pattern of retaliatory discharge by the states.” Warren v. Prejean, 301 F.3d 893, 899 (8th Cir.2002); see also Crumpacker v. Kans. Dep’t of Human Res., 338 F.3d 1163, 1170 (10th Cir.2003). As the Tenth Circuit explained:
The State argues that, while Congress may have identified a pattern of unconstitutional gender discrimination by the states, it failed to identify a pattern of retaliatory conduct by the states. This court, however, need not parse the legislative findings with regard to Title VII as finely as the State suggests.... To properly enact legislation under its § 5 authority, Congress need not identify a pattern of each form of gender discrimination in the workplace by the states. Rather, Congress need only identify a history and pattern of unconstitutional behavior on the part of states. Here, Congress clearly identified a pattern of unconstitutional employment discrimination on the basis of gender by the states.
Crumpacker, 338 F.3d at 1170 (alteration, citations, and internal quotation marks omitted).
Similarly, in Maitland, the Eighth Circuit rejected the defendants’ contention “that Congress failed to identify a history and pattern of unconstitutional employment discrimination by the States against men when it enacted and amended Title VII.” 260 F.3d at 964 (emphasis added). As the court concluded, the Constitution does not require “a parsing of the legislative findings or review of the ‘proportionality and eongruity’ of remedies to determine whether the Eleventh Amendment bar also has been removed with respect to Title VII actions by men.” Id. at 965. Applying the reasoning of these decisions here, the evidence before Congress of widespread race and gender-based employment discrimination by the States was sufficient to support its enactment of GERA, because Congress did not need to make explicit findings with regard to the particular subset of state employees covered by GERA.
In sum, given the deference we owe to Congress when it exercises its § 5 authority, it was entitled in enacting GERA to rely on the extensive evidence from 1972 of widespread race and gender-based discrimination by the States against their employees. Further, because Congress’ 1972 decision to exempt the state employees now covered by GERA appears to have been based not on a lack of evidence of discrimination but on political consider *490 ations, and because neither the Supreme Court nor our sister circuits have parsed more finely evidence of state constitutional violations, we must infer that the across the board findings of employment discrimination by the States encompassed these state employees.[7]
Finally, the majority contends that even if the evidence of discrimination was sufficient as of 1972, “[njothing in the record shows that a pattern of gender discrimination as to a governor’s staff, advisers, and policymakers existed in 1991 when GERA was enacted.” As discussed above, see supra at 487-90, however, Supreme Court decisions recognize that the discrimination Congress found in 1972 persisted at the time Congress enacted GERA. See also H.R.Rep. No. 102-40(11), at 5 n. 4 (1991), reprinted in 1991 U.S.C.C.A.N. 694, 698 (Congress declaring that, “[i]n support of the 1972 amendments to extend Title VII state and local governments,” it had “reaffirmed that employment discrimination was pervasive, complex and rooted in ‘employment systems’ and ‘various institutional devices.’ ”); 1991 Act, Pub.L. No. 102-166, 105 Stat. at 1071 (Congress stating that “additional remedies under Federal law are needed to deter unlawful harassment and intentional discrimination in the workplace”).
The third and final step in the “congruent and proportional” analysis is to determine whether the § 5 legislation “is an appropriate response to [the] history and pattern of unequal treatment,” Lane, 541 U.S. at 530, 124 S.Ct. 1978—i.e. whether the “rights and remedies created by the [legislation] against the States” are congruent and proportional to the constitutional violations. Garrett, 531 U.S. at 372, 121 S.Ct. 955.
I would hold that GERA is an appropriate response to the evidence of employment discrimination by the States. Most importantly, GERA provides for money damages only against state employers who “engaged in unlawful intentional discrimination” — conduct that also directly violates the Equal Protection Clause. See Okruhlik, 255 F.3d at 626 (“[T]he elements of a claim of intentional discrimination are essentially the same under Title VII and the Constitution.”). Thus, contrary to the legislation at issue in cases such as Garrett and Hibbs, GERA does not require the States to provide any substantive entitlements to their employees beyond what the Constitution requires.[8] Cf. Garrett, 531 U.S. at 361, 121 S.Ct. 955 (“[T]he Act requires employers to make reasonable accommodations to [disabled individuals] .... ” (alteration and internal quotation marks omitted)).
GERA also imposes other reasonable limits on damages. By incorporating 42 U.S.C. § 1981a(a), GERA provides the same damage remedies to the covered state employees that § 2000e-16 provides *491 to federal employees, instead of the more expansive remedies available to private sector employees.[9]
Specifically, GERA precludes punitive damages and caps compensatory damages at between $50,000 and $300,000, depending on the size of the state employer. See 42 U.S.C. § 1981a(b)(l), (b)(3). Also, prior to acting on a complaint by a state employee, the EEOC must refer the complaint to any state or local fair employment practices agency authorized to grant or seek relief from the alleged discrimination. Id § 2000e-16c(b)(2) (incorporating § 2000e-5(d)). Upon request by the state or local agency, the EEOC must then provide the agency “a reasonable time, but not less than sixty days ... to act under such State or local law to remedy the practice alleged.” [10] Id § 2000e-5(d).
Accordingly, GERA is congruent and proportional to the evidence of the States’ violations of its employees’ Fourteenth Amendment rights to be free from discrimination on the basis of race or sex. See Lane, 541 U.S. at 431, 124 S.Ct. 1833 (“Congress was justified in concluding that th[e] difficult and intractable problem [of disability discrimination] warranted added prophylactic measures.... The remedy Congress chose is nevertheless a limited one.” (alteration and internal quotation marks omitted)); Hibbs, 538 U.S. at 738, 123 S.Ct. 1972 (“We also find significant the many other limitations that Congress placed on the scope of [the FMLA].”).
* * *
For all of the above reasons, I would hold that Congress explicitly abrogated the States’ Eleventh Amendment immunity when it enacted GERA, and that the legislation is congruent and proportional to the racial and gender discrimination that Congress sought to remedy. Accordingly, I would reject Alaska’s Eleventh Amendment challenge, and allow the ALJ to rule on the merits of the complainants’ claims.

. Because the underlying factual dispute is not at issue in this appeal, I do not quarrel with the majority’s factual summary. I note, however, that the EEOC has yet to address the merits of Ward’s and Jones’ claims.

. Equal Employment Opportunity Act of 1972, Pub.L. 92-261, 86 Stat. 103, 42 U.S.C. § 2000e et seq.

. See 42 U.S.C. § 2000e(a) (defining "person” to include "governments, governmental agencies, [and] political subdivisions”); id. § 2000e(b) (defining "employer” to include, subject to certain conditions and exceptions, "a person engaged in an industry affecting commerce”); id. § 2000e(n) (defining “respondent” to include, inter alia, “an employer”).

. The decisions prior to 1991 address only back pay because compensatory damages *485 were unavailable prior to the 1991 Act. See Miller v. Maxwell’s Int’l Inc., 991 F.2d 583, 587 n. 2 (9th Cir.1993).

. Although GERA also protects against discrimination on the basis of religion, age, and disability, we do not address these provisions here, as we must identify with “some precision," Garrett, 531 U.S. at 365, 121 S.Ct. 955 (emphasis added), the constitutional rights at issue.

. See also 118 Cong. Rec. 4494 (statement of Sen. Allen) ("If it is so good for the States, why should it not be equally good for [congressional] employees.... I do not feel that the law should be applicable to the States, ... this is just another instance of the further encroachment by the Federal Government on the powers of local government.”).

. The majority argues that GERA cannot "piggyback” on Congress' findings from the 1972 amendments. The historical record does not support this colorful characterization of the EEOC’s position. The EEOC contends that we should infer that Congress' finding of widespread employment discrimination by the States in 1972 encompassed the subset of state employees covered by GERA. I agree with the EEOC that when Congress changed its position in 1991 and decided as a policy matter to cover these previously excluded state employees, it was, in light of the prior record, entitled to do so.

. For this reason, although Hibbs found that the FMLA was appropriate legislation in part because it exempted those state employees who are covered under GERA, the majority's reliance on Hibbs is misplaced. GERA is appropriate legislation even though it covers these employees, because, unlike the FMLA, it subjects state employers to financial burdens only when the harm suffered by the employee rises to the level of a constitutional violation.

. Congress also provides similar remedies to federal employees who are similarly situated to the state employees protected by GERA. Specifically, presidential and congressional employees, who were originally covered directly under GERA, are now covered by the Presidential and Executive Office Accountability Act, 3 U.S.C. § 401 et seq., and the Congressional Accountability Act of 1995, 2 U.S.C. § 1301 et seq.

. The EEOC followed these requirements in the instant case by transmitting copies of Ward’s and Jones' complaints to the Alaska State Commission for Human Rights, which "acknowledge^] receipt of the referenced charge[s]” but "indicate[d][its] intention not to initially investigate the[m].”