Rivera, J.
(dissenting). I agree with the majority that defendant’s third-party culpability claim is without merit. However, I would reverse the Appellate Division on the grounds that the jury selection process employed by the judge violated the defendant’s right to a trial by jury, and defendant was denied a fair trial due to her defense counsel’s failure to object to the prosecution’s inflammatory, irrevelant, and prejudicial gender-based summation comments. Therefore, I dissent.
I. Improper Delegation of a Judicial Function
Defendant challenges the trial judge’s jury selection procedure of permitting prospective jurors to self-excuse from jury service on hardship grounds. On the threshold preservation question, defendant claims that counsel’s failure to object is no bar to our review of her claim because the challenged procedure excluded the judge from an integral part of the defendant’s criminal trial, in violation of her constitutional right to trial by jury, and therefore constitutes a mode of proceedings error. These arguments find support in our case law and applicable statutes.
A mode of proceedings error is one that “affects ‘the organization of the court or the mode of proceedings prescribed by law’ ” (People v Walston, 23 NY3d 986, 991 [2014], quoting People v Patterson, 39 NY2d 288, 295 [1976]). It is “a ‘very narrow exception’ to the rule that errors made by a trial court may not be raised on appeal unless they are preserved at trial by timely objection” (id.) and is “reserved for the most fundamental flaws” (People v Becoats, 17 NY3d 643, 651 [2011]). A judge’s delegation of judicial oversight of a criminal trial may impact a defendant’s constitutional rights and thus falls within the narrow exception to our preservation rule (People v Ahmed, 66 NY2d 307, 310 [1985]).
This Court has made abundantly clear that “[t]he presence of and supervision by a Judge constitutes an integral component of the right to a jury trial” (People v Toliver, 89 NY2d 843, 844 [1996], citing Ahmed, 66 NY2d at 311-312; People v Torres, 72 NY2d 1007, 1008-1009 [1988]).
*161 “Since the selection of the jury is part of the criminal trial, a defendant has a fundamental right to have a Judge preside over and supervise the voir dire proceedings while prospective jurors are being questioned regarding their qualifications. A Judge who relinquishes control over the proceedings or delegates the duty to supervise deprives a defendant of the right to a trial by jury, requiring reversal” (Toliver, 89 NY2d at 844 [citations omitted], citing People v Velasco, 77 NY2d 469, 472 [1991], and People v Mullen, 44 NY2d 1, 4 [1978]).
Moreover, general questioning that leads to “the determination that a prospective juror [i]s disqualified before voir dire [i]s a matter for the court” (Velasco, 77 NY2d at 473). Based on these cases, in accordance with our recognition of the “constitutional guarantee of trial by jury” (Ahmed, 66 NY2d at 310) and a defendant’s fundamental right to judicial oversight of jury selection, a judge’s failure to supervise questioning of prospective jurors regarding lawful hardship grounds for exclusion from the petit jury, such as occurred here, constitutes a mode of proceedings error that is reviewable by this Court, notwithstanding counsel’s failure to object.
The majority concludes otherwise because, according to my colleagues, the defendant’s right to a trial by jury was not impaired by the procedure complained of since the hardship question posed by the judge preceded questioning regarding the jurors’ fitness to serve and formal voir dire (majority op at 156). The distinction drawn by the majority is meaningless and contrary to prior case law, which establishes that the duty to control jury selection attaches before the commencement of voir dire and includes determinations about the ability to serve (Velasco, 77 NY2d at 473 [“determination that a prospective juror was disqualified before voir dire was a matter for the court”]; People v Stiggins, 1 NY3d 529, 530 [2003] [prosecutor’s assistance to the judge throughout the jury selection, including prior to voir dire, “resulted in the judge ‘relinquish(ing) control’ over the jury selection process” (modification in the original)]).
Regardless of whether the issue before the court is a prospective juror’s “fitness to serve” or a hardship excuse, and whether the questions are posed before or during voir dire, what matters is whether the judge is absent from questioning designed to lead to the judge’s determination of whether a prospective juror should be relieved from service on defendant’s jury. A judge’s failure to supervise such questioning impacts a defend *162 ant’s right to a jury trial, and, as such, implicates the mode of proceedings prescribed by law.
By way of example we need only consider a comparison of the procedure followed here to that in People v Velasco. In Velasco, after the jury panel was sworn en masse, the judge asked general questions of the prospective jurors “designed to search out matters which might lead to disqualification, including physical impairments, family obligations, and work commitments” (77 NY2d at 472-473). The judge then allowed those prospective jurors wishing to respond to approach the bench and discuss the matter with the judge, in the presence of the prosecutor and defense counsel. This Court acknowledged the propriety of this process and the trial court’s ultimate decision-making role in jury selection (id. at 473). As the Court has since noted, Velasco involved questions “relating only to the qualifications of jurors in the general sense — questions concerning such matters as physical impairments, family obligations, and work commitments” (People v Sloan, 79 NY2d 386, 392 [1992]). Upon consideration of those questions, the Velasco Court “pointed out that the decisions of whether to excuse jurors on the grounds explored by such pre-voir dire screening were matters solely for the court” (id. at 392; Velasco, 77 NY2d at 473).
The procedure adopted by the court in defendant’s case is dissimilar to that followed in Velasco in significant, and, for purposes of our review of defendant’s appeal, ultimately determinative ways. As the record establishes, the judge began the jury selection process by telling the prospective jurors the name of the case and describing jury selection as a process by which the judge and attorneys ask questions of prospective jurors. The judge stated that “to begin this process of asking you questions and getting truthful answers from you the law requires that you swear or affirm to answer those questions truthfully.” The clerk then swore in the prospective jurors. The judge continued, introduced the attorneys and counsel, and asked if any prospective jurors knew them. In discussing the expected length of the trial, the judge broached the matter of potential excusal from service. He said that he knew the prospective jurors’ participation in the trial was a sacrifice, and that for some it “may be a hardship” because of “family obligations” or “business commitments,” and that he could excuse individual jurors from participation in defendant’s trial on those hardship grounds. He then asked those prospective jurors *163 who believed that jury service would be a hardship to identify themselves by raising their hands. The judge directed those with their hands raised to leave the courtroom and step outside into the hallway where “[t]he clerk will speak to you about your hardship.” From the record it is clear that some prospective jurors raised their hands, went outside, and did not return for further questioning regarding their potential service on the petit jury.
Thus, rather than discussing with these prospective jurors the nature of their claimed hardship — as in Velasco — the judge permitted off-the-record conversations with a clerk about the basis for hardship excuses, outside of the judge’s presence and without counsels’ participation. Yet, as our cases establish, a judge is solely responsible for supervision of jury selection and may not delegate individual juror qualification determinations (see Toliver, 89 NY2d at 844; Sloan, 79 NY2d at 392; Velasco, 77 NY2d at 473).
Moreover, under the Judiciary Law and the implementing regulations, a judge is statutorily obligated to make individualized hardship assessments and cannot grant a prospective juror’s application to be excused without giving some consideration to the juror’s reasons for the request. Judiciary Law § 517 provides that a judge may exercise discretion to excuse a juror from service. In determining whether to grant excusal from jury service on hardship grounds, a judge “shall consider whether . . . there is any other fact [which] indicates that attendance for jury service in accordance with the summons would cause undue hardship or extreme inconvenience to the applicant, a person under his or her care or supervision, or the public,” and shall be guided by standards promulgated by the Chief Administrator of the Courts (Judiciary Law § 517 [c]). Those standards provide a nonexhaustive, suggested list of categories of permissible excuses, such as service as a caregiver, financial hardship, and matters of conscience (22 NYCRR 128.6-a [d] [Guidelines for Postponements and Excusáis] [II] [B], [C]). These categories by their nature require some inquiry from the judge as to the underlying facts of the applicant’s request. Thus, by the plain language of the Judiciary Law and the administrative regulatory standards, a determination to grant a hardship excuse requires judicial exercise of discretion based on consideration of the individual prospective juror’s circumstances.
The majority misconstrues Judiciary Law § 517 in support of its erroneous conclusion that the judge did not delegate an *164 exclusive judicial function to a clerk (majority op at 157). Under the majority’s analysis defendant does not have a fundamental right to judicial oversight of hardship determinations because the law permits a trial judge as well as the commissioner of jurors to grant requests to be excused from jury service for hardship (majority op at 156). This ignores the simple fact that once the prospective jurors are brought before the judge, it is the judge who decides the application for a hardship excuse from service in defendant’s trial specifically (CPL 270.15 [1] [a]; Velasco, 77 NY2d at 473). As the record establishes, the judge in defendant’s case understood this was the nature of his authority as he alerted the prospective jurors that he was able to excuse them “from this trial.” In exercising that authority, the judge would necessarily base the hardship determination on a prospective juror’s personal situation, which could be affected by factors relevant to the particulars of defendant’s case, such as the expected length of the trial. Nothing in the law suggests that the commissioner has authority to supplant or supercede the judge’s determination, or that the judge’s decision is any less “a matter for the court.”
The procedure followed in defendant’s case also deviated from the procedure set forth in CPL 270.15 (1) (a), which concerns the examination of prospective jurors. Under that provision, no less than 12 persons shall be seated in the jury box and “immediately sworn to answer truthfully questions asked them relative to their qualifications to serve as jurors in the action.” Here, the judge swore in the prospective jurors before seating any person in the jury box. Moreover, CPL 270.15 (1) (a) requires that the judge make inquiries of the seated jurors about any fact relevant to their prospective jury service, and permits the judge to use a questionnaire to gather information for this purpose. The questionnaire responses are also provided to each attorney. Counsel thereafter has the opportunity to examine the prospective jurors. Thus, in accordance with this procedure, once the judge swears in a prospective juror, the judge makes general inquiries, followed by more specific questions as necessary, counsel has access to that information, there may be questioning by counsel, and then the court makes the final determination about the prospective juror’s ability to serve on a defendant’s jury. It may well be that the judge accepts the juror’s hardship ground, but a blanket hardship excuse without judicial consideration is not provided for by our laws.
*165 Indeed, the Third Department in People v Roblee (70 AD3d 225, 229 [3d Dept 2009]) struck down as improper a pre-voir dire selection procedure similar to that adopted in defendant’s case. In Roblee, the court asked a group of prospective jurors to raise their hands if one of a number of disqualifying conditions applied to them: if they had a serious health issue; if they knew the defendant, defense counsel, District Attorney, or Assistant District Attorneys involved in the case; if they, or a close friend or relative, had been accused, convicted, or the victim of domestic violence or any other crime; or if they had immediate reasons, personal or business, which would keep them from serving as jurors. The court informed the prospective jurors that it and the parties would speak with anyone who raised their hands, but the court first asked those who had identified themselves to step aside, with the provision that they would be called back if they were needed. However, voir dire was concluded without recalling or speaking further with those prospective jurors (id,.). As the Third Department noted, “[t]he proper practice would be for the court to immediately follow up with those potential jurors to identify their specific problems and determine whether those individuals should remain in the pool or be excused” (id., citing People v Henderson, 45 AD3d 903, 904 [2007], People v Gayle, 238 AD2d 133, 133-134 [1997], lv denied 90 NY2d 893 [1997], and Judiciary Law § 518).
As we have previously held, the fact that counsel may have consented, either affirmatively or by failing to object, does not constitute a waiver of the instant challenge to the judge’s procedure. Instead, to effectuate a valid waiver of the right to a trial by jury, a defendant must sign a written waiver “in person in open court in the presence of the court, and with the approval of the court” as required by CPL 320.10 (2) (Ahmed, 66 NY2d at 311 [internal quotation marks omitted], citing CPL 320.10 [2]).
In addition to constituting a violation of the defendant’s constitutional right to trial by jury, the judge’s practice resulted in a jury constituted in violation of this state’s policy that “all litigants in the courts of this state entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross-section of the community . . . and that all eligible citizens . . . shall have an obligation to serve when summoned for that purpose, unless excused” (Judiciary Law § 500). Even if service seems unjust because of the sacrifice *166 involved “it is necessary as long as we are to persist in our cherished belief that an accused felon is entitled to be tried by a jury of . . . peers” (People v Michael, 48 NY2d 1, 10 [1979]). The United States Supreme Court likewise has recognized that “|j]ury service is a duty as well as a privilege of citizenship; it is a duty that cannot be shirked on a plea of inconvenience” (Thiel v Southern Pacific Co., 328 US 217, 224 [1946]).
Under the circumstances presented in defendant’s case, I would find that the judge committed a mode of proceedings error when he abdicated his role in supervising the questioning that would serve as the basis for a determination on whether any of the prospective jurors should be excused on the grounds of hardship. Whereas in Velasco the judge was in control of the pre-voir dire screening and relied on the responses solicited during that procedure to make a judicial determination on the individual prospective jurors’ ability to serve, here the judge wholly relinquished his supervisory role to a clerk after inviting prospective jurors to assess the existence of a personal hardship warranting excusal from service on defendant’s jury. That procedure is impermissible and violated the defendant’s right to a jury trial. Harmless error analysis is inapplicable (People v Anderson, 70 NY2d 729, 730-731 [1987]; Hildreth v City of Troy, 101 NY 234, 239 [1886]), and the violation requires reversal.
II. Ineffective Assistance of Counsel
Defendant’s additional claim that she was denied a fair trial because defense counsel was ineffective for failing to object to various inflammatory gender-based comments during the prosecutor’s summation provides an alternative ground for reversal. While not every offensive comment or out-of-bounds remark by a prosecutor on summation, gone unchallenged, will serve to elevate defense counsel’s misstep to an error of constitutional proportion, counsel’s silence in defendant’s case during the prosecutor’s summation permitted statements to the jury that were deeply prejudicial to the defense. The record establishes that in his closing statement the prosecutor relied on gender stereotypes intended to undermine the defendant’s case by denigrating the defendant and women as a class, and simultaneously sought to shore up the credibility of the People’s sole witness. No defense strategy could be furthered by the prosecutor’s remarks, and therefore defense counsel was ineffective for failing to object.
*167 Under the state standard for ineffective assistance of counsel, in reviewing the representation provided to defendant, the Court must look to counsel’s performance in its totality (see People v Baldi, 54 NY2d 137, 147 [1981]) to determine whether defendant received meaningful representation (see People v Benevento, 91 NY2d 708, 712 [1998]). Under the more exacting federal standard, the defendant must establish that counsel’s assistance was deficient and that the errors were prejudicial, in that they were “so serious as to deprive the defendant of a fair trial” (Strickland v Washington, 466 US 668, 687 [1984]). A claim of ineffectiveness based on
“[d]efense counsel’s inaction in the face of prosecu-torial misconduct made during closing argument is subject to the same ‘meaningful representation’ standard applicable to other trial errors. Under that standard, where defense counsel fails to object when faced with a pattern of prosecutorial misstatements far afield from acceptable argument, such as statements that misrepresent evidence central to the determination of guilt, and where there is no apparent strategic explanation for defense counsel’s silence, defendant has been deprived of meaningful representation and the constitutional right to a fair trial” (People v Wright, 25 NY3d 769, 780 [2015]; see also People v Fisher, 18 NY3d 964, 967 [2012] [“defense counsel’s failure to object to any, let alone all, of the prosecutor’s egregiously improper departures during summation, particularly in the highly charged, potentially outcome determinative context in which they occurred, deprived defendant of the right to effective assistance of counsel”]).
The majority concludes that “the prosecutor’s appeal to defendant’s gender [is] inexcusable and irrevelant,” the statements about the gendered nature of the crime and the perpetrator “are simply ridiculous comments,” and the prosecutor’s “remarks were inflammatory and were improper summation” (majority op at 159). The majority further states that its “decision should not be interpreted as countenancing such summation remarks,” and that trial courts “should reprimand counsel for making such remarks” (majority op at 159). I agree, and find unfathomable the majority’s conclusion that counsel was not ineffective for failing to object to these obviously “inflamma *168 tory,” “irrevelant,” and “ridiculous” comments that in the future will subject counsel to judicial reprimand. The sole basis for the majority’s conclusion is its speculation that defense counsel may have reasonably believed the prosecutor’s remarks would alienate the jury, and counsel’s silence was a strategic choice (majority op at 159). That conclusion is not plausible given the history of sex discrimination in the justice system, as well as the nature of the summation comments presented in this appeal and their impact on the defense and the People’s case.
As a starting point, certain foundational matters should guide this Court’s analysis of defendant’s claim. Foremost is the fact that “our Nation has had a long and unfortunate history of sex discrimination” (Frontiero v Richardson, 411 US 677, 684 [1973]), and that inequality based on gender was often legally sanctioned (see e.g. Nevada Dept. of Human Resources v Hibbs, 538 US 721, 729 [2003] [“The history of the many state laws limiting women’s employment opportunities is chronicled in — and, until relatively recently, was sanctioned by — this Court’s own opinions”]; United States v Virginia, 518 US 515, 531 [1996] [“Through a century plus three decades and more of that history, women did not count among voters composing ‘We the People’; not until 1920 did women gain a constitutional right to the franchise. And for a half century thereafter, it remained the prevailing doctrine that government, both federal and state, could withhold from women opportunities accorded men so long as any ‘basis in reason’ could be conceived for the discrimination” (citations omitted)]; Martha Chamabas, The Architecture of Bias: Deep Structures in Tort Law, 146 U Pa L Rev 463, 463 nn 1, 2 [1998] [historically, only men could sue for loss of consortium or loss of a child’s services]).
Over time society’s appreciation of this history and its impact on society and individuals has only deepened. The enduring role of gender stereotypes and bias reminds us that it is not so easy to ignore over a century of discrimination. We do not simply wake up one morning to find, as if by magic, that our communities are gender bias-free, and that individuals and the collective population have been able to cleanse the taint of discrimination. Rather, gendered perceptions of women’s roles and abilities continue to plague workplaces, homes, and our justice system (see e.g. Burlington N. & S. F. R. Co. v White, 548 US 53, 70 [2006] [reassignment of plaintiff to less-desirable job duties and 37 days of suspension without pay sufficed to support a claim for retaliation under Title VII for plaintiff’s *169 reporting of her supervisor’s derogatory gender-based comments]; Back v Hastings On Hudson Union Free School Dist., 365 F3d 107, 120 [2d Cir 2004] [“stereotyping in the view that a woman cannot ‘be a good mother’ and have a job that requires long hours, or in the statement that a mother who received tenure ‘would not show the same level of commitment (she) had shown because (she) had little ones at home,’ ” could establish gender discrimination under the Equal Protection Clause]; Hibbs, 538 US at 736 [“Stereotypes about women’s domestic roles are reinforced by parallel stereotypes presuming a lack of domestic responsibilities for men. Because employers continued to regard the family as the woman’s domain, they often denied men similar accommodations or discouraged them from taking leave”]; see also Lauren Stiller Rikleen, ABA Presidential Task Force on Gender Equity and the Commission on Women in the Profession, Closing the Gap: A Road Map for Achieving Gender Pay Equity in Law Firm Partner Compensation [2013]; Ronit Dinovitzer, Nancy Reichman & Joyce Sterling, The Differential Valuation of Women’s Work: A New Look at the Gender Gap in Lawyers’ Incomes, 88 Soc Forces 819 [2009]; Molly McDonough, Damaging Disrespect: Minorities and Women Still Experience Bias in the Justice System, Though It Isn’t Always Obvious, 89 ABA J 56 [2003]; Hon. Dorothy W. Nelson, Introduction to the Effects of Gender in the Federal Courts: The Final Report of the Ninth Circuit Gender Bias Task Force, 67 S Cal L Rev 731 [1994]).
In recognition of the continued presence of sex discrimination in our society, our courts have sought to address inequality in the justice system by addressing gender stereotypes in the courtroom (see e.g. J. E. B. v Alabama ex rel. T. B., 511 US 127, 129 [1994] [declaring that a peremptory challenge based on “gender, like race, is an unconstitutional proxy for juror competence and impartiality”]; New York State Judicial Committee on Women in the Courts, Women in the Courts: A Work in Progress [Apr. 2002]; Lynn Hecht Schafran & Norma J. Wikler, National Judicial Education Program, Gender Fairness in the Courts: Action in the New Millennium [Nov. 1, 2001]). Those efforts are part of the broader commitment to create courtrooms free of discrimination and bias, and a legal system based on just treatment.
Thus, to ensure a defendant’s trial is fair and that prejudice does not affect the outcome, a prosecutor may not rely on stereotypes as part of the People’s case. As a general matter, *170 courts have recognized a prosecutor’s summation that “appeal [s] to prejudice and passion . . . violates every basic concept of fair trial” (People v Hearns, 18 AD2d 922, 923 [2d Dept 1963] [prosecutor’s summation which emphasized that defendant and two key witnesses were of the same race was impermissible]). Reliance on impermissible characteristics “impermissibly alter[s] the jurors’ view of both the [defendant] and the issues” (Glenn v Bartlette, 1996 WL 648679, *9 [ND NY, Oct. 31, 1996, No. 934-CV-1394] [prosecutor’s introduction of race to the proceedings in combination with other violations necessitated the grant of habeas corpus and a new trial], affd sub nom. Glenn v Bartlett, 98 F3d 721 [2d Cir 1996]).
While our courts have had occasion to comment specifically on references to race and sexuality in the courtroom, the concerns that underlie those cases are no less applicable to a prosecutor’s deployment of stereotypes about women. Thus, judicial considerations of the propriety of those comments, particularly those contained in prosecutor summations, should guide analysis of defendant’s case. As those cases instruct, summation grounded in offensive and biased argument “creates the grave danger that jurors will be distracted from evaluating a case strictly on the basis of the evidence presented and will instead approach the evidence from the point of view of biases triggered by racially influenced fears or prejudices” (People v Rivera, 136 AD2d 520, 521 [1st Dept 1988], affd 73 NY2d 941 [1989]). There is no place in a trial for remarks that attempt to make a connection between defendant’s group association and certain criminal activities because those comments “appeal[ ] to the fears and prejudices of the jury . . . and [are] designed to sidetrack the issue away from defendant’s guilt or innocence” (People v De Vito, 21 AD3d 696, 700 [3d Dept 2005]). Thus, an appeal to the jury based on stereotyping “can serve no purpose other than to arouse racially prejudiced attitudes and to undermine the jury’s dispassionate and objective consideration of the evidence adduced at trial” (People v Thomas, 129 AD2d 596, 597 [2d Dept 1987]). As such, argument based on stereotype is divisive and “offends the democratic and logical principle that race, creed or nationality, in themselves, provide[s] no reason for believing or disbelieving a witness’ testimony” (Hearns, 18 AD2d at 923; see also McFarland v Smith, 611 F2d 414, 416-417 [2d Cir 1979] [“(t)o raise the issue of race is to draw the jury’s attention to a characteristic that the Constitution generally commands us to *171 ignore. Even a reference that is not derogatory may carry impermissible connotations, or may trigger prejudiced responses in the listeners that the speaker might neither have predicted nor intended”]).
Defendant claims that a competent attorney would have realized that the prosecutor’s comments were objectionable and detrimental to the defendant, given the gendered nature of the remarks and their prejudicial impact on her defense. Defendant asserts that her attorney should have objected to the prosecutor’s statements that the case was “about jealousy, it’s about rage, it’s about obsession. . . . It’s about hell have [sic] no fury as a woman’s scorn [sic],” and that “[o]nly a woman would inflict this kind of beating. Only a woman who is trying as hard as she can to maim and disfigure her rival and to have an avenue for her rage and her jealousy would cause this kind of injury.” She further complains that counsel failed to stop the prosecutor from arguing that it was significant that the attack took place in the complainant’s apartment because “[i]t’s a good location for a woman trying to take out her shame and rage and her jealousy on the face of her rival.”
The prosecutor’s assertions that only a woman could inflict the type of harm evidenced in this case, and that the injury could only be caused by a woman trying to disfigure her rival, were statements grounded in unfounded gender stereotypes which, as the majority concedes, were improper summation (majority op at 159). As the record establishes, the prosecutor exhorted the jurors to rely on gender stereotypes of vengeful spurned women and argued without any record evidence that the crimes could only be committed by a woman, but not just any woman. The prosecutor claimed that the crime had to have been committed by a particular type of woman, namely a scorned woman who would do anything against another who was romantically involved with her man. Of course, these stereotypes have no grounding in fact and certainly not in any evidence placed before the jury during the trial. As the majority acknowledges, these types of remarks are “inflammatory” and “simply ridiculous” (majority op at 159).
However, the comments are impermissible not solely because they are offensive, but because they associate particular criminal conduct with a defining group characteristic specific to defendant, namely her gender. Courts have rejected affinity group classifications because of their potential impact on the ultimate determination of guilt (United States v Rodriguez *172 Cortes, 949 F2d 532, 541-542 [1st Cir 1991] [error to admit identification card showing defendant to be Colombian as “the effect . . . was to allow the jury to determine guilt based on (defendant’s) supposed nationality”]; United States v Doe, 903 F2d 16, 21-22 [DC Cir 1990] [“It is much too late in the day to treat lightly the risk that racial bias may influence a jury’s verdict in a criminal case”]; Carter v Rafferty, 621 F Supp 533, 546 [D NJ 1985] [“The prosecutor, . . . without basis in the record, imputed the ‘powerful motive of revenge’ on the entire black community, and thus on the petitioners. This despite the absence of any evidence of either petitioner having such racial hatred”], affd in part, appeal dismissed in part 826 F2d 1299 [3d Cir 1987]).
Moreover, because defendant presented an alibi defense, the case came down to a credibility determination, requiring the jury to decide whether to believe the complainant or defendant. Thus the prosecutor’s comments that sought to paint defendant as a violent harpy and the complainant as a vulnerable and stalked woman were designed to make defendant appear less believable while also enhancing the complainant’s credibility. One of the most difficult stereotypes to unsettle is that of the weak, desperate, needy, helpless woman. Part of the prosecutor’s summation relied on that stereotype to make the complainant sympathetic and more credible to the jury. The prosecutor asked the jury to
“[i]magine what [the victim] must have felt the first time she looked at herself in the hospital mirror. Every one of those blows, with the exception of her hand, where she got stepped on and her stomach, where she was stood on, before she got dragged inside the apartment, to her face, her hair, her head. This crime is a woman [sic].”
The prosecutor contrasted the complainant’s weak position to that of the defendant who the prosecutor argued
“wants to wait until [the complainant] has no escape. She can almost get inside the apartment. She can almost get down the stairs. . . . She is trapped in this tiny little landing with the keys in the door. No where to run. That’s the kind of fear [defendant] was trying to put in [the complainant’s] heart.”
Use of gendered stereotypes to enhance the credibility of a witness is impermissible (Rivera, 136 AD2d at 521; Hearns, 18 *173 AD2d at 923; McFarland v Smith, 611 F2d 414, 419 [2d Cir 1979] [“The credibility of the state’s witness! ) should depend on an assessment of many pertinent factors, but the state should not be entitled to have its witness’s credibility enhanced simply because (the witness is) not (a) member! ) of a group that might be prejudiced against the defendant”]). All the more so where the case turns on the credibility of the sole witness (People v Robinson, 17 NY3d 868, 870 [2011]).
No defense strategy explains allowing without objection this double harm to the defense, not even the strategy identified by the majority, namely that the prosecutor’s comments were so offensive that they would alienate the jury (majority op at 159). This would have been a nonsensical response to the summation because it allowed the prosecutor to draw from the well of gendered images of women as both vengeful and vulnerable, predator and prey. Moreover, assuming, as the majority does, that the jury might be offended by the prosecutor’s comments, that does not mean defendant would gain a tactical advantage. Defendant and the complainant are both women and the jury could just as well have viewed both as mistreated by the prosecutor, allowing the People to draw on the jury’s sympathies for the complainant. Thus, whether the jury embraced the stereotypes or rejected them outright, there was a potential upside to be gained for the prosecutor’s case, and no disadvantage to objecting.
There is yet another reason to reject the argument that defense counsel made a strategic choice not to challenge the prosecutor’s remarks. If the jury was repulsed by the prosecutor’s characterizations of women, then by his silence defense counsel risked the appearance that he condoned the remarks, possibly drawing the ire of the jurors. If, instead, he stood up for his female client, he would be viewed no worse by the jury, and perhaps considered more favorably. Therefore, contrary to the majority’s opinion, objecting was the only proper defense strategy because it would have avoided any negative perceptions of the defendant and her defense counsel and potentially enhanced counsel’s standing in the eyes of the jurors.
Judges Abdus-Salaam, Stein and Fahey concur; Judge Rivera dissents in an opinion; Chief Judge DiFiore and Judge Garcia taking no part.
Order affirmed.